UNITED STATES v. FIVE BOXES OF ASAFŒTIDA.

(District Court, E. D. Pennsylvania. September 19, 1910.)

No. 7.

1. DRUGGISTS (§ 2*)—PURE FOOD AND DRUG ACT—OFFENSES.

Pure Food and Drug Act (Act Cong. June 30, 1906, c. 3915, 34 Stat. 768 [U. S. Comp. St. Supp. 1909, p. 1188]) § 2, provides that the introduction into any state from any other state of any drug which is adulterated or misbranded is prohibited, and any person who shall ship or receive and, having so received, shall deliver, or offer to deliver, in original unbroken packages, for pay or otherwise, to any other person, any such article so adulterated or misbranded, shall be guilty of a misdemeanor. *Held*, that the mere receipt of an adulterated or misbranded drug did not constitute an offense, where claimants had not delivered, or offered to deliver, the drug in unbroken packages; claimants having retained the packages in their possession, opened and tested them, and caused the standard of strength, quality, and purity to be plainly stamped on the containers prior to seizure.

[Ed. Note.—For other cases, see Druggists, Dec. Dig. § 2.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. DRUGGISTS (§ 11*) — PURE FOOD AND DRUG ACT — CONSTRUCTION — FOR-FEITURE.

Pure Food and Drug Act, § 2, makes it a misdemeanor for any person having received adulterated or misbranded drugs from another state to ship the same from one state to another or to deliver the same in un-broken packages for pay or otherwise, or offer to deliver the same to another person so adulterated or misbranded, and section 10 declares that such articles shall be liable to seizure and forfeiture when in the course of being transported from state to state, or when having been transported they remain unloaded, or unsold, or in the original packages. *Held*, that such sections were independent of each other, and hence it is not essential to the forfeiture of adulterated or misbranded drugs, under section 10, that the owner shall have been guilty of violating section 2.

[Ed. Note.—For other cases, see Druggists, Dec. Dig. § 11.*]

3. COMMERCE (§ 41*)—INTERSTATE COMMERCE—REGULATION—ORIGINAL PACK-AGES.

Pure Food and Drug Act, § 10, provides that any drug that is adulter-ated or misbranded within the meaning of the act. and is being trans-ported from one state to another for sale, or having been transported re-mains unloaded, or unsold, or in the original packages, shall be subject to forfeiture. *Held*, that where, after an adulterated or misbranded drug had been transported in interstate commerce and received by the consignee who was the owner, the packages were opened and samples taken that the strength, quality, and purity might be tested, such sam-pling did not constitute a breaking of the original packages.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 41.*]

4. DRUGGISTS (§ 11*)—PURE FOOD AND DRUG ACT—FORFEITURES—"ADULTER-ATED."

Pure Food and Drug Act, § 7, provides that drugs shall be deemed adulterated when they differ from the standard of strength, quality, or purity as determined by the test prescribed in the United States Phar-macopœia or National Formulary official at the time of investigation, and that no drug shall be deemed adulterated if the standard of strength, quality, or purity be plainly stated on the container, although the stand-ard may differ from the test. Section 10 declares that any drug that is adulterated or misbranded and is being transported from one state to another for sale, or having been transported remains unsold, or in the original or unbroken packages, shall be liable to condemnation in any District Court of the United States and condemned. *Held*, that a drug is not adulterated or misbranded so as to be subject to condemnation un-less adulterated or misbranded at the time of seizure, and hence, where asafœtida below the prescribed test and misbranded was received by claimants in interstate commerce and tested and correctly branded be-fore seizure, it was not subject to forfeiture.

[Ed. Note.—For other cases, see Druggists, Dec. Dig. § 11.*

For other definitions, see Words and Phrases, vol. 1, pp. 210–212.]

Libel by the United States against Five Boxes of Asafœtida. Dis-missed.

Jasper Yeates Brinton, for the United States.
James Collins Jones, for respondent.

HOLLAND, District Judge. This libel is filed by the government under the provisions of the act of June 30, 1906, for the purpose of effecting the condemnation of five boxes of asafœtida, which it is alleged were adulterated within the meaning of this act of Congress. An attachment was issued and the drug seized by the government,

after which a claim was made by Smith, Kline & French Company, in whose possession the asafœtida was found, and an answer duly filed by them, in which the claimants urge that the libel be dismissed and that the drug seized under the attachment be returned to them.

. From the libel and answer, upon which the case was argued, we gather the following undisputed material facts:

On the 3d day of May, 1910, T. M. Curtius, of the city of New York and state of New York, shipped via Clyde Steamship Company, a common carrier, five boxes of asafœtida to Smith, Kline & French Company, of the city of Philadelphia, in the state of Pennsylvania, for which, at the time, the latter paid Curtius in full and received the asafœtida in their possession, at their place of business, No. 429 Arch street, in this city. "Being a drug sold under a recognized name in the United States Pharmacopœia," it was adulterated within the meaning of the act of Congress at the time of transportation, in that it differed from the strength, quality, and purity as determined in the test laid down in the United States Pharmacopœia official at the time of the investigation, in this: That the standard of strength, quality, and purity determined by the test required that not less than 50 per cent. of the asafœtida should dissolve in alcohol, and, when incinerated, the said alcohol should yield not more than 15 per cent. of ash; whereas, less than 50 per cent. of the asafœtida contained in these five boxes was soluble in alcohol, and when incinerated yielded more than 15 per cent. of ash.

The claimants, immediately after the receipt of this asafœtida and before the service of the attachment, opened the packages and took therefrom sufficient for the purposes of examination, and caused the standard of strength, quality, and purity to be plainly stamped upon the containers, as required by the seventh section of the pure food act, and all the containers were so marked at the time of the service of the attachment. Smith, Kline & French Company, in whose possession the drug was found, were the owners thereof, having paid the full purchase price before the service of the attachment; but after its receipt they had never delivered it in original and unbroken packages for pay, or otherwise, or offered to deliver it to any other person before the containers were duly marked as required by the act.

Upon these facts the claimants urge that the libel should be dismissed, for the reasons: (1) That no forfeiture could be had under section 10 because under section 2 the facts in this case would not support a criminal prosecution against the claimants; (2) that the taking of samples operated to remove the merchandise from the provision of the act as "original packages"; and (3) that the proper labeling of the packages before seizure relieved them from liability to forfeiture under the terms of section 10.

The provisions of the act upon which the government relies to enforce its claim for forfeiture of this merchandise, upon the facts as above stated, are as follows:

In section 2 it is provided that the introduction into any state from any other state of any article of drug which is adulterated or misbranded within the meaning of this act is hereby prohibited, and any person who shall ship or deliver for shipment from any state to any

other state, or shall receive in any state from any other state, and, having so received, shall deliver, in original unbroken packages, for pay or otherwise, or offer to deliver to any other person, any such article so adulterated or misbranded within the meaning of the act, shall be guilty of a misdemeanor.

Section 7 provides:

"First. If, when a drug is sold under or by a name recognized in the United States Pharmacopœia or National Formulary, it differs from the standard of strength, quality, or purity, as determined by the test laid down in the United States Pharmacopœia or National Formulary official at the time of investigation: Provided, that no drug defined in the United States Pharmacopœia or National Formulary shall be deemed to be adulterated under this provision if the standard of strength, quality, or purity be plainly stated upon the bottle, box, or other container thereof although the standard may differ from that determined by the test laid down in the United States Pharmacopœia or National Formulary."

And section 10 provides that any article of drug that is adulterated or misbranded within the meaning of this act, and is being transported from one state to another for sale, or, having been transported, remains unloaded, unsold, or in original or unbroken packages, shall be liable to be proceeded against in any District Court of the United States within the district where the same is found, and seized for confiscation by a process of libel for condemnation.

It is obvious that the claimants could not be convicted of a misdemeanor, as section 2 requires not only that they should have received the adulterated or misbranded drugs from another state, which they have done in this case, but the section further requires that, after having so received it, they deliver it in unbroken packages, for pay or otherwise, or offer to deliver it to another person so adulterated or misbranded within the meaning of the act, which they have not done. They have received it from another state, but they neither delivered nor offered to deliver it, for pay or otherwise, in the unbroken packages.

It is urged that, by reason of the fact that a criminal prosecution could not be sustained against them, no forfeiture can be had under section 10. We do not consider this contention sound, because section 2 and section 10 are not at all interdependent. The misdemeanor denounced in section 2 is entirely distinct and independent of the grounds of forfeiture in section 10. Congress has clearly defined in section 2 what acts or omissions shall constitute a misdemeanor with regard to adulterated or misbranded articles of food or drug, and, in order to ascertain whether or not any person is guilty of having violated the provisions of this section, it is not at all necessary to refer to section 10, as section 2, as to what shall be deemed a misdemeanor, is complete within itself.

As to adulterated articles, it is a misdemeanor (1) to ship from one state to another; (2) to receive and deliver, or offer to deliver the same for pay, in unbroken packages. Such articles are liable to seizure and forfeiture under section 10: (1) When in the course of being transported from state to state; (2) when, having been transported, they remain (a) unloaded, or (b) unsold, or (c) in the original packages.

It will be seen that section 10 fully and completely defines the conditions under which such articles are liable to seizure and forfeiture.

There is no reference to or dependence upon the misdemeanor defined in section 2, and it is unimportant, as far as the forfeiture proceedings are concerned, whether or not any person could be convicted under section 2. Congress has defined fully in section 10 when and under what circumstances the article of food or drug shall be forfeited without reference to the guilt of the owner under section 2. Under the common law, the offender's right was not divested upon forfeiture proceedings until conviction, but this doctrine never was applied to seizures and forfeitures created by statute in rem for violations of the revenue law of the government. The thing there is primarily considered the offender, or rather, the offense was attached primarily to the thing, and this whether the offense was malum prohibitum or malum in se. It therefore follows that when the thing is inculpated under an in rem statutory provision it may be forfeited, although the act which caused the forfeiture was not authorized or done by or with the consent or knowledge of the owner. Dobbins v. United States, 96 U. S. 395, 24 L. Ed. 637, 19 Cyc. 1357.

The purpose of this act is to conserve the public health by preventing interstate commerce in poisonous or deleterious food and drugs, and, in order that this may be effected, it is not only made a misdemeanor under the' act, but the article of food or drug adulterated or misbranded is declared to be forfeited as an offending thing which threatens the health of the citizen and therefore subject to seizure without regard to the acts or knowledge of the owners or claimants.

Neither do we think that the taking of samples operated to remove the merchandise from the provision of the statute as original packages. There is no exact and comprehensive definition of the term "original package." The cases heretofore considered involving this question have been disposed of by the application not of a precise definition, but of certain broad general principles to the precise and particular facts.

An extract from the opinion of the Supreme Court in Brown v. Maryland, 25 U. S. 419, 6 L. Ed. 678, is probably the nearest guide we may have as to what may be considered an original package:

"It is sufficient for the present to say, generally, that, when the importer has so acted upon the thing imported that it has become incorporated and mixed up with the mass of property in the country, it has, perhaps, lost its distinctive character as an import, and has become subject to the taxing power of the state."

In the case at bar, the claimants, upon receipt of these packages of asafœtida, merely took samples therefrom for the purpose of examination, and in order that they might comply with the provisions of the act in regard to causing the standard of strength, quality, and purity to be plainly stamped upon the containers. This could not be considered to have destroyed the commercial form, and obviously did not operate to "incorporate" the same with the general property of this state.

A substantially similar question was presented to the Supreme Court of Iowa in 1895, in the case of Wind v. Iler & Co., 93 Iowa, 316, 61 N. W. 1001, 27 L. R. A. 219, in which case the bungs in certain barrels of liquor were drawn for the purpose of testing the contents be-

fore accepting the same by the purchaser, and the question was whether it was still to be regarded as interstate commerce. Upon this point the court said:

"The question yet remains: Did the drawing of the bung in the barrels in which the liquors were shipped into the state have the effect claimed for it by the appellant? We think not. The barrel was opened in order that a small quantity might be taken from it and tested—not used—in order to determine whether the liquors would be returned or not. We do not think that the inspecting or testing of an imported article to determine whether it shall be returned has the effect to make it a part of the general mass of property in the state."

This conclusion is supported by the decision in two well considered federal cases.

The first case (United States v. Fox, Fed. Cas. No. 15,155), decided in 1869, was a suit by the United States under the internal revenue act of July 13, 1866 (14 Stat. 144), to recover the penalties therein prescribed for the sale of perfumery without affixing a proper stamp thereon. A proviso in the act prescribed that, when imported perfumery was sold in the original and unbroken package in which the bottle or other inclosure was packed by the manufacturer, the person so selling should not be liable to the aforesaid penalty.

Fox sold one small wooden box containing twelve 1½-ounce bottles of hair oil and a similar but larger box containing twelve bottles of pomade. He opened both boxes, so that the purchaser might examine the contents. The top of the smaller box was put on again before delivery without change of the contents. In the larger box, containing the pomade, Fox, at the request of the purchaser, substituted three smaller bottles taken from the shelf of the store, and nailed up the box. In respect to the smaller box of oil the court said:

"Although the top of this box was taken off by the defendant, Fox, it was only for the purpose of enabling the witness Quivey to ascertain the kind and quality of its contents, and before the sale and delivery to him it was put on again, with the contents unchanged in kind or quantity. Under these circumstances the defendant must be considered as selling an unbroken package, the contents of which were not then required to be stamped."

But as to the sale of the box of pomade the court said:

"The package was opened, and, three bottles being taken out of it, it was sold with only the remaining nine bottles in it. This was a broken package, and so the court instructed the jury."

The verdict of the jury in favor of the defendant, Fox, was set aside on motion of the United States, upon the ground that the package of pomade was not an original package; the court holding:

"Goods are sold 'in original and unbroken package' within the meaning of the act of July 13, 1866 (14 Stat. 144), although the package is opened for inspection, if closed again before delivery without the contents being changed.'

In the other case (In re McAllister [C. C.] 51 Fed. 282, decided in 1892), the facts were these: Two men, emissaries of a butter dealer in Baltimore, went to the store of McAllister, a dealer in oleomargarine, and sought to buy butter. McAllister stated that he had none, but could supply oleomargarine. They requested him to remove the

lid from the tub of oleomargarine that they might look at it. He did so, stating that he could not sell less than ten pounds, as it reached him in the tub from Chicago. They purchased the tub and forthwith informed on him. He was duly tried in the state court and convicted. The state Court of Appeals affirmed the conviction, and McAllister applied to the Circuit Court of the United States for a writ of habeas corpus, on the ground that the sale of the tub of oleomargarine was a sale of an original package and beyond the power of the state to prohibit, which it sought to do in an act of the Legislature. The court granted the writ and announced the proposition of law involved, in the following syllabus to the case:

"Removing the lid of an original package of oleomargarine, so that a prospective buyer may examine its contents, is not such a breaking of the package as will destroy its original character."

In reaching the above conclusion the court said:

"It is argued that the taking the lid from the tub containing this oleomargarine was a breaking of the package so as to destroy its original character. This in no sense did it do. The goods had in no way become commingled with his property or the general property of the state. Low v. Austin, 13 Wall. 29, 20 L. Ed. 517. Any one calling for oleomargarine with an honest purpose would have purchased this package as an original one, even if he knew it had had its lid lifted off once to see whether or not it held another substance than it purported to hold. The laws of the United States recognize oleomargarine as a merchantable article. Being such, while a state may perhaps regulate its sale, it cannot prohibit its importation. The statute in question does this, and is unconstitutional, and in this respect void. The petitioner is discharged."

In the light of the foregoing adjudications, it cannot be held that the mere taking of a sample from the original package for the purpose of examination and for the purpose of complying with the act to plainly state upon the container the standard of strength, quality, and purity of the drug was a breaking up of the original package and operated to incorporate the same in the general property of the state. The original character of the package was not, for the reasons stated by the claimants, destroyed.

The third defense interposed by the claimants, that the proper labeling of the packages before seizure relieved them from liability to forfeiture under the terms of section 10, must be regarded as more substantial and as a good ground for dismissing the libel. Under this in rem statutory forfeiture procedure of section 10, the article of drug itself is the thing inculpated, and it must be adulterated or misbranded within the meaning of the act at the time the government seizes it. It was not adulterated when seized, but branded as required by law. It is not sufficient that it was adulterated when it was being transported from one state to another and liable to forfeiture at that time. It was not then seized, and there is no language of the act to authorize seizure for any past offending condition of the drug. A drug that "is" adulterated or misbranded (is the language used) and "is" being transported from one state to another for sale shall be liable, etc. A drug, which, "having been transported, remains unloaded, unsold, or in original unbroken packages," shall it be liable to forfeiture for some previous irregularity, if not adulterated or misbranded at the time of

seizure? It is not so stated in the act. There is no seizure of a drug that "was" adulterated authorized. Having been transported and remaining unloaded, unsold, or in the original unbroken packages, it can only be forfeited when it "is" adulterated and misbranded when seized.

These boxes of asafœtida when seized by the government were not adulterated within the meaning of the act. It is true they "had been transported" (from one state to another for sale) and "remained in the original unbroken packages at the time the government seized them"; but they were not adulterated.

Under section 7 this asafœtida was adulterated only in case its standard of strength, quality, and purity was not plainly stamped upon the containers, but if so marked it was not adulterated. The liability to forfeiture of the drug, therefore, would depend upon whether or not the containers were so marked at the time the government seized them. They were so marked and not liable to seizure.

The containers having been branded according to the requirements of the act at the time of seizure, there is no valid ground for forfeiture, and the libel in this case is dismissed, and the government is directed to return to the claimants the five boxes of asafœtida seized under the attachment.