EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* BENITO CARRIL, acusado y apelante.

No. 3960.—*Sometido:* Enero 16, 1930. *Resuelto:* Junio 27, 1930.

---

* NOTA: Véase el prefacio.

*José Carbia Miranda,* abogado del apelante; *R. A. Gómez,* abogado de *El Pueblo,* apelado.

EL JUEZ ASOCIADO SEÑOR WOLF, emitió la opinión del tribunal.

Benito Carril, un farmacéutico, fué acusado ante la Corte Municipal de San Juan de haber infringido la sección 1ª. del Reglamento No. 53. La denuncia no especificaba cuál era el reglamento infringido y en ella se alegaba que el delito fué cometido de la manera siguiente: Que en 17 de julio de 1928, y en Santurce, calle Loíza esquina a la calle Carrión, del distrito judicial municipal de San Juan, Benito Carril, que es farmacéutico con farmacia abierta al público, en Santurce, etc., tenía expuestas a la venta cápsulas gelatinosas en un frasco rotulado cápsulas de aceite de castor de 2½ gramos. Que de dichas cápsulas vendió a la familia Rabainne, de Santurce, cuatro cápsulas como cápsulas de aceite de castor, las que tomó un miembro de dicha familia Rabainne sintiéndose al poco tiempo con síntomas de intoxicación, siendo asistido por los Dres. M. Pujadas Díaz y Víctor Gutiérrez Ortiz. Que el Ledo. Carlos del Rosario, Jefe de División de Alimentos y Drogas del Departamento de Sanidad Insular, ocupó dicho frasco rotulado cápsulas de aceite de castor a la farmacia Carril, y examinadas dichas cápsulas contenidas en el frasco por el Laboratorio Químico Insular, resultaron ser de tetracloruro de carbono, y no de aceite de castor, como expresaba el rótulo del frasco ocupado al Sr. Carril en su

farmacia de Santurce. Que este hecho es contrario a la ley, constituyendo una infracción al artículo 1 del Reglamento No. 53 de mayo 10 de 1917. (No se expresa de qué departamento.) El acusado fué convicto ante la corte municipal, e igualmente en apelación en la corte de distrito.

Cuando el caso fué traído para ser discutido ante esta corte, surgió la cuestión de si un farmacéutico que de buena fe vende drogas falsamente rotuladas no por él sino por otros, podía ser acusado de delito; respecto a si no se podía imponer a un farmacéutico el deber de no vender ninguna droga a menos que resultare ser lo que aparecía en el rótulo. Tomaremos conocimiento judicial del hecho de que usualmente los farmacéuticos reciben de fabricantes de productos químicos toda clase de drogas y medicinas corrientes (*standard*). Se presentó el problema de si se podía exigir de un farmacéutico que analizara antes de venderla toda droga recibida por él de los citados fabricantes de productos químicos. También surgió un problema incidental con relación a si el poder de policía podía extenderse hasta el extremo de hacer a un farmacéutico criminalmente responsable a menos que se demostrara la existencia de una intención criminal. Bajo estas circustancias se hace necesario examinar cómo y cuándo y con qué autoridad el supuesto delito fué definido por las leyes de Puerto Rico.

■■ Se imputa al apelante una infracción del artículo primero del Reglamento 53. Este resulta ser un reglamento del Departamento de Sanidad, promulgado por el Gobernador Yager el 10 de mayo de 1917, y prescribe lo siguiente:

"Artículo 1.—Ninguna persona, sindicato, corporación, institución de cualquier carácter que sea, venderá, ofrecerá, expondrá en venta o tendrá para la venta, hará conducir o almacenará alimento o droga alguno, para el consumo en la Isla de Puerto Rico, que esté adulterado o falsamente rotulado, dentro del concepto legal que se define en este Reglamento, y que es el mismo que se expresa en los artículos 7 y 8 de la Ley de Alimentos y Drogas, aprobada por el Congreso de los Estados Unidos, en junio 30, 1906.''

La proclama se hace a virtud de la Ley No. 81 de marzo 14, 1912. Las partes pertinentes de dicha ley dicen así:

"Artículo 12.—Será deber de la Junta Insular de Sanidad actuar como corporación consultiva y legislativa en todo asunto concerniente a la salud pública, y prescribirá toda regla, reglamento y ordenanza que se requiera por esta Ley, para regir en todos los municipios de Puerto Rico, con el fin de prevenir y suprimir las enfermedades contagiosas y epidémicas; destruir los vehículos de propagación del paludismo, tuberculosis y otras enfermedades transmisibles, e intervenir en cualquier otro servicio que afectare a la salud pública, como el abastecimiento de agua, alimentos y bebidas, construcción de edificios en las poblaciones, ventilación, drenaje e instalaciones de plomería sanitarias, hoteles, posadas, casas de huéspedes, casas de dormir, cafés, restaurants, fondas, cantinas, casas de vecindad, casas privadas, casas en general, escuelas, fábricas y talleres, establecimientos industriales, peligrosos, insalubres o incómodos; mataderos y matanza, mercados, carnicerías, basuras, transporte de basuras y abonos orgánicos, limpieza de letrinas y sumideros, vías públicas, ferrocarriles, tranvías, hospitales, casas de salud, sanatorios, animales y ganado, sanidad e higiene rurales, enfermedades transmisibles, cadáveres, cementerios, inhumaciones y exhumaciones, autopsias, embalsamamientos, transporte de cadáveres, barberías y peluquerías, baños públicos, vaquerías o depósitos de leche.

"Será el deber de la Junta Insular de Sanidad prescribir las reglas y reglamentos sobre las condiciones en que deban tenerse a los empleados del Gobierno o de particulares, en lo que dichos reglamentos fueren necesarios en interés de la salud pública; sobre las condiciones que deban observarse en las vaquerías y panaderías, así como en conexión con la matanza de animales para alimento y para regir el transporte de leche y otros productos de vaquerías, pan y otros productos de panaderías; sobre la carne y productos de carne; y sobre la extracción de basuras y residuos de todas clases; *Disponiéndose,* que nada de lo contenido en este artículo autorizará la promulgación de reglamentos que priven a un empleado del sexo femenino, del derecho a elegir el médico que deba practicar el examen en cuanto a su condición física. Definirá la clase de aparatos sanitarios que deberán instalarse y conservarse en edificios públicos y particulares; prescribirá reglas y reglamentos para la inhumación, exhumación y transporte de cadáveres, y los que deban observarse al dar cuenta de las enfermedades infecciosas y contagiosas, y sobre el aislamiento y

tratamiento de las mismas; y para impedir la contaminación de todas las aguas que se usen para beber o para fines domésticos.

"Artículo 13.—El Director de Sanidad someterá a la consideración y aprobación del Consejo Ejecutivo, toda regla y reglamento que se prescribiere por la Junta Insular de Sanidad, con expresión de sus ideas endosadas en el mismo. El Consejo Ejecutivo podrá enmendar o modificar dichas reglas y reglamentos y devolverlos al Director de Sanidad para ser reconsiderados por la Junta Insular de Sanidad. Si finalmente existieren diferencias entre el Consejo Ejecutivo y la Junta Insular de Sanidad, en lo que respecta a las reglas y reglamentos que deban ponerse en vigor, se nombrará una comisión de conferencia por los presidentes de ambas corporaciones, que consistirá de tres miembros de la Junta Insular de Sanidad y tres miembros del Consejo Ejecutivo; *Disponiéndose,* que en caso de desacuerdo o empate en la votación, el Gobernador de Puerto Rico designará a uno de los jueces del Tribunal Supremo, quien durante ese tiempo formará parte de la comisión con el fin de decidir la cuestión en controversia. Las conclusiones de la mayoría de la comisión que así se nombrare regirán y serán aceptadas por la Junta Insular de Sanidad y por el Consejo Ejecutivo, como obligatorias y terminantes. Dichas reglas y reglamentos, una vez aprobados por el Consejo Ejecutivo, serán promulgados por el Gobernador de Puerto Rico y serán publicados en dos periódicos de circulación general en la Isla, y desde entonces y sucesivamente tendrán la fuerza y efecto de ley.

"Artículo 33.—Toda persona que infrinja cualquier disposición de los reglamentos de sanidad puestos en vigor según se dispone por esta Ley, será castigada con multa que no será menor de un dollar ni mayor de cien dollars, o con prisión desde uno a treinta días, o con ambas penas a discreción del Tribunal."

De forma que el delito imputado en esta denuncia no ha sido definido por ninguna ley general de la Legislatura y depende, de existir, de la facultad que tiene el Departamento de Sanidad para aprobar reglamentos.

El artículo 335 del Código Penal dispone:

"Todo farmacéutico, droguista o persona dedicada al comercio de drogas o medicinas, o empleada como dependiente o vendedor por dicha persona, que al envolver cualesquiera drogas o medicinas, o preparar algún pedido de drogas o medicinas, voluntariamente, o por descuido o ignorancia, dejare de rotularlas, o pusiere sobre cualquier caja, botella u otro envase conteniendo drogas o medicinas algún mar-

bete, sello u otra designación del contenido que no fuese la verdadera; o que substituyere el artículo prescrito o pedido, por otro distinto, o que pusiere mayor o menor cantidad que la prescrita u ordenada, o de otro modo se separare de lo fijado en la prescripción u orden que pretendiere seguir, a consecuencia de lo cual peligrare la vida o salud de las personas, será reo de *misdemeanor*, y si resultare en muerte, incurrirá en *felony.*''

Este artículo define los deberes de un farmacéutico y las infracciones que le pueden someter a una prosecución pública. A no ser que tenga el consentimiento claro de la Legislatura, ningún cuerpo facultado para aprobar reglamentos puede aumentar o disminuir los deberes así definidos. La Legislatura ha hablado.

Suponiendo, sin embargo, que el artículo 335 no abarcara todo el campo, entonces resolvemos que la facultad de definir el delito que aquí se trata de castigar no pudo ser ni fué delegada a un cuerpo facultado para adoptar reglamentos.

Hemos visto que la sección 13 de la Ley No. 81, *supra,* dice que los reglamentos promulgados tendrán fuerza de ley. *Caha* v. *United States,* 152 U. S. 211, 218, es la autoridad principal sobre el alcance de reglamentos aprobados por departamentos y se hizo distinción del caso *United States* v. *Eaton,* 144 U. S. 677, 688. Empero nada hay en el caso de Caha que cambie las reglas fundamentales establecidas en el de *United States* v. *Eaton, supra.* Allí se resolvió que era necesario que existiera una autoridad estatutoria suficiente para declarar que cualquier acto u omisión constituyera un delito criminal. En el caso de *United States* v. *Grimaud,* 220 U. S. 506, 520, se resolvió que si bien era difícil definir la línea que separaba la facultad legislativa para adoptar leyes y la autoridad administrativa para aprobar reglamentos, el Congreso puede delegar el poder para suplir detalles cuando ha indicado tal intención en el estatuto.

Se resolvió que ciertos reglamentos no se convierten en leyes por castigarse una infracción de los mismos como delitos públicos. Lo que así se delega a un cuerpo facultado para

aprobar reglamentos debe participar de la naturaleza de poderes no legislativos.

Esta jurisprudencia ha sido más o menos revisada por esta corte. Quizá el caso más pertinente es el de *El Pueblo* v. *Ortiz,* 29 D.P.R. 424. En dicho caso dijimos:

"Por supuesto que 'la facultad conferida de adoptar reglamentos para llevar a cabo los fines de un estatuto debe ser ejercitada dentro de los poderes delegados, es decir, debe limitarse a detalles para reglamentar la forma de procedimiento para poner en vigor la ley como ha sido promulgada, y no puede extenderse a enmendar o adicionar los requisitos del estatuto mismo.' 12 C.J. 845, 846. Pero ya hemos visto que se trata aquí de una cuestión de detalle en harmonía con el pensamiento fundamental del legislador y con el propósito de que tal pensamiento sea una realidad en la práctica."

Allí citamos del caso de *El Pueblo* v. *Neagle,* 21 D.P.R. 356, 362, caso civil que a su vez contenía una cita de *United States* v. *Grimaud, supra,* reproducida en *Pueblo* v. *Ortiz, supra.*

De acuerdo con las autoridades nos sentimos obligados a resolver que la Legislatura no podía delegar en el Departamento de Sanidad la facultad de aprobar un reglamento castigando como delito la venta en general de artículos falsamente rotulados. Este es un delito por sí mismo y no un mero asunto administrativo o la provisión de detalles.

Esto se hace más aparente al considerar la cuestión de la intención criminal. La Legislatura no puede hacer que un cuerpo facultado para adoptar reglamentos determine cuándo puede y cuándo no puede pasarse por alto tal intención, como en los casos de adulteración de leche.

Además, no creemos que la ley de 1912 delegara la facultad de adoptar el reglamento aquí promulgado. Al Departamento de Sanidad se dieron amplios poderes para proteger la salud de la comunidad, para impedir la diseminación de enfermedades y otros asuntos de naturaleza pública, pero no hallamos intención alguna de otorgar a dicho departamento la facultad de fijar los deberes que aquí se tratan de castigar.

Somos de opinión que la Legislatura por sí misma no podía aprobar una ley imponiendo a un farmacéutico el deber de garantizar todo artículo que vendiera cuando él mismo no había tomado parte en la fabricación del artículo vendido sino que meramente lo recibía de casas comerciales que generalmente son dignas de confianza. La verdadera responsabilidad criminal descansa entonces en las casas que así han fabricado, vendido o transportado artículos en el comercio interestadual. Si bien la prosecución de esos delitos puede ser más difícil, no es imposible.

En el Reglamento 53, según ha sido promulgado, se hace referencia a las secciones 7 y 8 de la Ley Nacional de Alimentos y Drogas. Estas secciones definen cuándo una droga debe ser considerada como adulterada o falsamente rotulada. Si se examina la ley nacional de 1906 se verá que en los territorios se castiga solamente la fabricación mas no la venta en general de artículos adulterados o falsamente rotulados. El Congreso, dentro de los sitios que están bajo su jurisdicción, no fué al extremo de tratar de castigar la venta de tales artículos adulterados o falsamente rotulados; tampoco la Legislatura de Puerto Rico lo ha hecho así conforme está redactada la ley.

*La sentencia apelada debe ser revocada y absuelto el acusado.*

Los Jueces, Presidente Señor del Toro y Asociado Señor Hutchison, están conformes con la sentencia.

OPINIÓN CONCURRENTE DEL JUEZ PRESIDENTE SR. DEL TORO

Dada la trascendencia de las conclusiones a que se llega en la opinión que sirvió de base para revocar la sentencia apelada y absolverse al acusado, considero un deber expresar separadamente mi criterio.

Estoy conforme con la revocación porque estimo que "la Legislatura no podía delegar en el Departamento de Sanidad la facultad de aprobar un reglamento castigando como delito

la venta en general de artículos falsamente rotulados. Esto es un delito por sí mismo y no un mero asunto administrativo o la provisión de detalles.'' Opinión de la corte emitida por el Juez Asociado Sr. Wolf.

Pero no puedo estar conforme en que la Legislatura por sí misma no hubiera tenido facultad para aprobar una ley similar a la regla que sirvió de base para declarar culpable al acusado en este caso. Si el criterio de la opinión prevaleciera, habría que declarar, a mi juicio, inconstitucional la Ley Nacional de Alimentos y Drogas.

La salud del pueblo, la garantía de la comunidad, exigen que se considere penable el solo hecho de la venta del alimento o droga adulterados, como el único medio eficaz, quizá, de impedir y castigar violaciones semejantes a la perseguida en este caso, que a veces cuestan la vida a los ciudadanos. Se ha resuelto que:

''La intención sigue el acto. La verdadera interpretación de la ley de alimentos y drogas es que el comerciante o fabricante vende un artículo a su propio riesgo y que está obligado a entender los ingredientes del producto.'' United States v. Hobart, et al., Circuit Court, S. D. New York, November 15, 1910.

''Un alimento o droga que esté adulterado o erróneamente rotulado es algo ofensivo que amenaza la salud del ciudadano y por tanto está sujeto a que se incauten de él y sea confiscado independientemente de los actos o conocimiento del dueño o reclamante de tal alimento o droga. La cuestión de intención no forma parte del caso.'' United States v. Five Boxes of Asafoetida, 181 Fed. 561.

''En ninguna parte de la ley (Federal Food and Drug Act) se requiere prueba de intención mediante el uso de las palabras 'a sabiendas,' o 'voluntariamente' o similares. Destruiría la ley y la anularía enteramente el permitir que la intención de la persona que la infringe fuese considerada como una defensa.'' United States v. 36 Bottles of London Dry Gin, 210 Fed. 271.

''Prueba de la ausencia de conocimiento por parte del comerciante de que un artículo es obnoxio a alguna disposición de la ley, es solamente una defensa cuando se compra el artículo a algún fabricante y se obtiene una garantía de tal fabricante de que el artículo cumple con los requisitos de la ley.'' United States v. Mayfield, et al., 177

Fed. 765. Véase "Federal Food and Drugs Act and Decisions," compiladas por C. A. Gwinn, bajo la dirección del "Solicitor General" de los Estados Unidos, Washington, 1914.

Esta última decisión indica el camino que deben seguir los que compran para revender artículos que no pueden examinar por sí mismos.

Estoy autorizado para decir que el Juez Asociado Sr. Hutchison está conforme con esta opinión.