RE TAXES PACIFIC GUANO & FERTILIZER
COMPANY.

Nos. 1981 and 1981A.

Argued May 18, 1932.                    Decided June 3, 1932.

Perry, C. J., Banks and Parsons, JJ.

OPINION OF THE COURT BY PERRY, C. J.

The Pacific Guano & Fertilizer Company, a corporation, returned its property situate in Honolulu at a total valuation of $1,626,070 and its property situate in Hilo at $288,637, or a total return of $1,914,707. The assessor assessed the Honolulu property at $3,422,522 and the Hilo property at $735,263, or a total assessment of $4,157,785.

The territorial board of equalization to which the taxpayer appealed valued the Honolulu property at $3,339,180 and the Hilo property at $560,820, or a total valuation of $3,900,000. From the decision of the board the taxpayer appeals to this court.

In its return the taxpayer valued its property item by item. The land was returned at $381,084, the improvements at $494,565 and the personalty at $750,422, or a total of $1,626,070. Upon the return relating to the property in Honolulu the assessor, in the columns entitled "assessor's value of land, improvements," made entries showing that he valued the Honolulu property, item by item, as follows: the land at $409,628, the improvements at $516,131 and the personalty at $750,422,—or a total, by this method, of $1,676,181. In the return relating to the Hilo property the company valued its land at $155,302 and its personalty at $133,335, or a total of $288,637. In this latter return the assessor made no entries showing the value attached by him to these items of property separately. C. G. Owen, manager and treasurer of the taxpayer, gave testimony tending to show the correctness of the valuations returned by the corporation for the items of property separately, both in Honolulu and in Hilo. No testimony on this subject was given by or on behalf of the assessor. While the total valuation attributed by the assessor to the various items of property, considered separately, exceeds that of the taxpayer by the sum of $50,111, the taxpayer in argument in this court practically waived this comparatively small difference. In so far, therefore, as the values of the separate items are concerned, the aggregate is found to be, upon the undisputed evidence, $1,676,181 for the Honolulu property and $288,637 for the Hilo property, or a total of $1,964,818.

The assessor arrived at his total valuation of $4,157,785

by capitalizing the average profits of the company for a few years last past and by using also what is known in our tax decisions as the "stock sale method," the two methods, according to his testimony, producing fairly close results. The argument on behalf of the assessor seems to proceed largely upon the assumption that under the "enterprise for profit" provisions of our statutes there is such a thing as an enterprise, an entity, to be valued and taxed, which is distinct from the property composing the enterprise and which may include property which under our statute is nontaxable. If this is a correct statement of an assumption underlying the argument for the assessor, then the assumption is not well founded in law. It has been clearly held by this court that under the provisions just referred to it is the property which in combination forms the basis of an enterprise for profit which is taxable and that further only those portions of the property are so taxable which are included within the statutory definitions of "real property" and "personal property." In other words, for the purposes of our tax laws there is no such entity as an "enterprise" for profit separate and distinct from the property which is used together in the business. The provisions relating to enterprises for profit were first enacted into law in 1896. Laws of 1896, Act 51. In February, 1897, in *Inter-Island Steam Nav. Co.* v. *Shaw,* 10 Haw. 624, 625, 629, 630, this court said: "Each law, the old and the new, provides for a tax upon real property and upon personal property, and defines what is included under each of those terms. * * * We may readily concede that, as contended for the plaintiff, the sections in question" (referring to what is now R. L. 1925, §§ 1320, 1334), "as well as numerous other portions of the statute, show that the legislature intended to tax only the property forming the basis of an enterprise for profit, and did not intend to tax the

enterprise as such itself. \* \* \* It is true, these considerations are referred to in section 17" (now the third paragraph of the proviso in section 1320) "only in connection with the value of the 'enterprise,' but we have no hesitation in holding that 'enterprise' as here used was intended to mean 'the property forming the basis of an enterprise,' as in the preceding paragraph, or 'the property constituting an enterprise' as in the succeeding paragraph; this is also obvious from the language of Sec. 68" (now section 1334) "which requires the person making the return to set forth the aggregate value of the combined property of the enterprise. \* \* \* This is holding, not that the words 'combined property' in other parts of these sections were intended to mean 'enterprise' but that 'enterprise' in the third paragraph of Sec. 17 was intended to mean 'combined property of an enterprise.' " Property, therefore, which is not included within the statutory definitions of real property and personal property is not taxable and, if its income is used in the capitalization of profits method, its value must be deducted before the true aggregate value of the property forming the basis of the enterprise can be ascertained.

This taxpayer owns in Honolulu various parcels of land with twenty-four buildings thereon. Twenty-one of these buildings are used for warehouse purposes. It owns also certain machinery, trucks and other personalty. It is engaged in the business of buying and selling materials which are used as fertilizers by sugar cane plantations and pineapple plantations and perhaps other lesser industries. None of these materials is mined on its own lands. All of them are purchased outside of the Territory. Some are brought from the mainland of the United States and some are imported from South America and from Europe. Some of these materials are sold direct from the ship upon its arrival within the Territory. Upon these

importations the company merely charges a commission (three per cent) as its compensation for the services rendered. A small part of its profits, perhaps ten per cent or fifteen per cent, is derived from the sale of materials received from without the Territory and converted by its machinery into new chemical combinations. The major part of its business, however, consists merely in the mixing, without chemical changes, of the imported materials and in the selling of the new mixtures thus produced. Those who purchase fertilizers from the taxpayer prescribe the mixture that is desired and the company mixes and furnishes in accordance with the prescriptions. Of the fertilizer materials dealt with by the corporation only from one-fourth to one-fifth is on hand on January 1 of each year, the taxation date. The remaining three-fourths or four-fifths is imported from time to time during the remaining three hundred and sixty-four days of the year.

It is entirely clear that under our tax laws property which is not within the Territory on the assessment date is not taxable and that, too, even though the property has been purchased by the taxpayer and is on the assessment date on the high seas on the way towards the Territory. "Goods purchased without and not yet within the Territory at the date of assessment, are not taxable under the laws of this Territory." *Assessor* v. *Castle & Cooke,* 15 Haw. 50. The undisputed evidence shows that the profits which have been capitalized by the assessor were derived in large part from the company's dealings in fertilizing materials which were not within the Territory on the assessment date, as well as in part from its dealings in similar materials which were on hand within the Territory on the first day of January. The taxpayer made its profits in no way other than in buying and selling these imported materials. In the case of *Oahu Railway*

& *Land Co.* v. *Shaw,* 11 Haw. 210, 211, a case in which the taxpayer enjoyed certain statutory exemptions from taxation, it was held that "it would be manifestly impossible to assess the value of the company's combined property as an 'enterprise for profit,' for by statute a large portion of it is free from taxation." The same thing could well be said in this instance. It is true that the use of this taxpayer's combined property, including its machinery and other appliances, doubtless contributed in some measure to the accrual of profits. But the precise, or even approximate, extent of this contribution, in terms of money, is not shown by any evidence before the court. The income or profits from these services alone, as distinguished from the operations of buying and selling, would in all probability, it may be ventured, not justify any valuation substantially larger than the aggregate of the valuations of the separate parts. However that may be, there is no evidence from which a finding could be made of a value of the aggregate derived from a capitalization of profits from services only.

The enterprise for profit tax is not an income tax even though the income derivable from property is one of the important factors in determining this value. *Tax Assessment Appeals,* 11 Haw. 235, 238. Nor is it a sales tax. When, as in the case at bar, a taxpayer owns land and buildings and machinery used in mixing materials or manufacturing other chemicals therefrom, but derives its profits very largely, if not wholly, merely from buying and selling merchandise, most of which is not within the Territory on the assessment date, the capitalization of profits method of arriving at the true value of the property constituting the enterprise is impracticable of application and becomes wholly inapplicable. The same is true of the stock sales method, the market value of the stock being undoubtedly affected very largely, if not

wholly, by the showing of profits derived from the business of buying and selling. When these two methods are inapplicable it becomes necessary to resort to the third method of valuing separately the various items of property owned by the taxpayer.

In its returns, in Schedule 7, which is a "statement of assets and liabilities at the close of business, December 31, 1929," the taxpayer reported "merchandise in original packages" valued at $807,275.81 and "Hilo plant, merchandise" valued at $222,047. This merchandise, however, was not included in the property returned as subject to taxation. The merchandise referred to in these two items included phosphate rock, in bulk, stored in separate bins in the warehouses, in the condition in which it was received from the ships in which it was imported; nitrate of soda which had been transported to Honolulu in bags, but which had been removed from the bags and placed in bulk in separate bins in the warehouses, the removal of the bags being due to the fire hazard which their presence involved; and other fertilizing materials in the original bags in which they were brought by the ships. The question argued by the parties concerning these three classes of merchandise is whether under the Constitution of the United States the Territory of Hawaii could impose a tax on them under the surrounding circumstances. The constitutional provision in question is clause 2 of Section 10 in Article I and reads as follows: "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports." The meaning and intent of this provision have been often considered by the Supreme Court of the United States. In *Brown* v. *Maryland*, 12 Wheat. (1827) 419, 436, 438, 441, it was said: "What, then, are 'imports?' The lexicons inform us, they are 'things imported.' If we appeal to usage for the meaning of the word, we shall receive the same

answer. They are the articles themselves which are brought into the country. 'A duty on imports,' then, is not merely a duty on the act of importation, but is a duty on the thing imported. It is not, taken in its literal sense, confined to a duty levied while the article is entering the country, but extends to a duty levied after it has entered the country. * * * There is no difference, in effect, between a power to prohibit the sale of an article, and a power to prohibit its introduction into the country; the one would be a necessary consequence of the other. No goods would be imported, if none could be sold. No object of any description can be accomplished by laying a duty on importation which may not be accomplished with equal certainty, by laying a duty on the thing imported, in the hands of the importer. * * * But while we admit that sound principles of construction ought to restrain all courts from carrying the words of the prohibition beyond the object the constitution is intended to secure; that there must be a point of time when the prohibition ceases, and the power of the state to tax commences; we cannot admit, that this point of time is the instant that the articles enter the country. It is, we think, obvious, that this construction would defeat the prohibition.

"The constitutional prohibition on the states to lay a duty on imports, a prohibition which a vast majority of them must feel an interest in preserving, may certainly come in conflict with their acknowledged power to tax persons and property within their territory. The power, and the restriction on it, though quite distinguishable when they do not approach each other, may yet, like the intervening colors between white and black, approach so nearly as to perplex the understanding, as colors perplex the vision in marking the distinction between them. Yet the distinction exists, and must be marked as the cases arise. Till they do arise, it might be pre-

mature to state any rule as being universal in its application. It is sufficient for the present to say, generally, that when the importer has so acted upon the thing imported, that it has become incorporated and mixed up with the mass of property in the country, it has, perhaps, lost its distinctive character as an import, and has become subject to the taxing power of the state; but while remaining the property of the importer, in his warehouse, in the original form or package in which it was imported, a tax upon it is too plainly a duty on imports, to escape the prohibition in the constitution."

The Supreme Court of the United States, it will thus be seen, refused to lay down a rule or standard of measurement which will be applicable in all cases. It recognized that while the thing imported did not cease to be an import at the very instant that it entered the country, nevertheless there must necessarily come a time later when, mixing with the mass of property in the country, it would lose its distinctive character as an import. The "original package" test was not laid down as being the sole test in all cases. It would apply where there were original packages, but would not apply where there were no packages at all, such as are known to the English language. If the thing imported is still in its "original form," in the ownership and the warehouse of the importer, and not yet sold by the importer, it still retains its distinctive character as an import and is immune from local taxation. In *Low* v. *Austin,* 13 Wall. 29, 34, Mr. Justice Field, speaking for the same court, said, referring to earlier decisions: "In the nature of things the line of division is, in some degree, vague and indefinite, and I do not see how it could be drawn more accurately and correctly, or more in harmony with the obvious intention and object of this provision of the Constitution. Indeed, goods imported, while they remain in the hands of the

importer, in the form and shape in which they were brought into the country, can, in no just sense, be regarded as a part of that mass of property in the State usually taxed for the support of the State government. * * * The goods imported · do not lose their character as imports, and become incorporated into the mass of property of the State, until they have passed from the control of the importer or been broken up by him from their original cases. Whilst retaining their character as imports, a tax upon them, in any shape, is within the constitutional prohibition." To the same effect are *May* v. *New Orleans,* 178 U. S. 496, 507-510; *Gulf Fisheries Co.* v. *MacInerney,* 276 U.S. 124, 126, 127; and *Coe* v. *Errol,* 116 U.S. 517, 525-528.

Oil imported in a tank steamer, when pumped into the tanks on shore, still retains its state as an import. *Galveston* v. *Mexican Petroleum Corporation,* 15 F. (2d) 208.

Those of the imported materials which were on hand on the taxation date and still in the original bags in which they were imported are clearly within the rule laid down in *Brown* v. *Maryland, supra.* They were still imports and not within the power of the Territory to tax. The phosphate rock was brought in ships in bulk. It could not have been stored in original packages, for it did not come in any packages whatever. It would be an undue stretch of language to say that the ships were the original packages. The test as to "original packages" does not apply in such a case. The phosphate rock, within the decision in the *Maryland* case, was in the warehouse of this taxpayer in the "original form" in which it was imported, that is, it was in bulk; it was being kept in the warehouses in bins separate from the general mass of property in this Territory. The sole reason for removing the nitrate of soda from the bags was as a precaution against fire, there being a peculiar fire hazard resulting from the combination of nitrate of soda and the bags.

When subsequently sold, these nitrates were again placed in bags. Even though stored in the warehouses of the taxpayer, in bulk after removal from the bags, these nitrates were still the property of the importer, had not been sold and were not mixed with the general mass of the property of the Territory. Within the contemplation of the constitutional provision the nitrates still were, in our opinion, imports. Upon the same principle it has been held that oleomargarine imported in a tub still remained an import in spite of the fact that the lid had been removed from the tub in order to permit a tasting of the contents (*In re McAllister,* 51 Fed. 282, 283); that asafoetida imported in a box was still an import in spite of the fact that a sample had been taken from the original package "for the purpose of examination" and for the purpose of complying with the act to plainly state upon the container the standard of strength, quality and purity of the drug (*United States* v. *Five Boxes of Asafoetida,* 181 Fed. 561, 567); and that sponges were still an import although the bales in which they were imported, fastened with cords, had been unfastened for the purpose of examining the contents, and the contents had then been returned to their proper places and the bales refastened (*Greek-American Sponge Co.* v. *Richardson Drug Co.,* 124 Wis. 469, 473, 474).

In this case, upon the undisputed testimony and with the aid of the assent or waiver of the taxpayer, the value of the Honolulu property is fixed at $1,676,181, and that of the Hilo property at $288,637, or, in the aggregate, at $1,964,818.

*U. E. Wild* (*Smith, Wild & Beebe* on the briefs) for the taxpayer.

*H. T. Kay,* First Deputy Attorney General (*H. R. Hewitt,* Attorney General, with him on the brief), for the assessors.