[Civ. No. 11010.   First Appellate District, Division Two.—March 21, 1939.]

VICTOR JOHNSON, Respondent, v. THE COUNTY OF LOS ANGELES (a Body Politic), Appellant.

Everett W. Mattoon, County Counsel, J. H. O'Connor, County Counsel, and Gordon Boller, Deputy County Counsel, for Appellant.

Thomas D. Aitken for Respondent.

STURTEVANT, J.—The plaintiff sued to recover four separate items of taxes alleged to have been illegally collected. The defendant filed a general demurrer, it was overruled, and from the judgment entered in favor of the plaintiff the defendant has appealed. A statement of the facts, the defendant says, is as follows.

Plaintiff at all times herein concerned was the owner of, and did business under the name, Victor Johnson & Company, as a wholesale dealer in twine, rope and cordage. He had the exclusive agency in the United States for the product of, and was under agreement to buy exclusively from, Johnson-Pickett Rope Company, a Philippine corporation, manufacturer. The twine, rope and cordage herein taxed was brought into the United States from Manila, Philippine Islands, under the following circumstances: Plaintiff ordered his stock in trade, as needed, from Johnson-Pickett Rope Company, upon its quotation of C. I. F. prices. He maintained, for the purpose, an established credit of $25,000 with Pacific National Bank of San Francisco, California. The seller filled plaintiff's orders by shipment on the first available steamer from Manila to San Francisco, under bill of lading designating as the consignee "Order of the Pacific National Bank of San Francisco, California, ultimate destination, notify Messrs. V. Johnson and Company, San Francisco, California," and at the same time drew its draft on Pacific National Bank of San Francisco for the price, C. I. F., San Francisco.

After plaintiff's order of the goods herein taxed was filled and the draft therefor drawn, the seller discounted the draft with a Manila bank, a correspondent of Pacific National Bank of San Francisco, delivering with said draft the bill of lading and a policy insuring the shipment in favor of Johnson-Pickett Rope Company in San Francisco "as well as in his or their own name or names, as for and in the name or names of all and every other person or persons to whom the same

doth, may, or shall appertain in part or in whole". The Manila bank mailed the draft with bill of lading attached and insurance policy to Pacific National Bank of San Francisco for acceptance and payment, by the same steamer that carried the goods, if said steamer carried mail, or by the next mail-carrying steamer leaving Manila for California. Said draft, bill of lading and insurance policy, in regular course of mail, were delivered to Pacific National Bank in San Francisco, which thereupon accepted and/or paid the draft and notified plaintiff. Plaintiff appeared at the office of Pacific National Bank in San Francisco and executed a trust receipt to pay said bank the amount of the draft, plus agreed charges, within ninety days. Thereupon said bank endorsed over and delivered to plaintiff said bill of lading, with which plaintiff then obtained the goods and transported them to his warehouse in Los Angeles, where, on the first Monday of March of the two years in question, they were in storage waiting sale in the original package.

The last sentence above set forth is a conclusion of the defendant. In the third paragraph of the complaint the plaintiff alleged "That during the months of June and July, 1934, and July, 1935, there were deposited in the warehouse of plaintiff in the city of Los Angeles twine, rope and cordage . . . " In paragraph 6 he alleged that he " . . . thereupon entered and caused to be entered the goods in the custom house at Los Angeles and secured the necessary and usual permit to discharge and land the same . . . " Those allegations imply that the ship which received the merchandise at Manila landed the shipment at Los Angeles and that the plaintiff received it at that port and placed it in a warehouse.

The defendant claims that under the facts this plaintiff was not the importer. Both parties admit that the merchandise was imported. Both parties concede that they are bound by the rule stated in *Brown* v. *Maryland,* 12 Wheat. 419 [6 L. Ed. 678]. On page 439 Mr. Chief Justice Marshall, speaking of the meaning of article I, section 10, clause 2 of the federal Constitution, said: "It has already been shown, that a tax on the article, in the hands of the importer, is within its words; and we think it too clear for controversy, that the same tax is within its mischief. We think it un-

questionable, that such a tax has precisely the same tendency to enhance the price of the article, as if imposed upon it while entering the port.'' In that case there being a controversy as to the meaning of ''entering the port'', on page 441, the writer continued: ''It is sufficient for the present to say, generally, that when the importer has so acted upon the thing imported, that it has become incorporated and mixed up with the mass of property in the country, it has, perhaps, lost its distinctive character as an import, and has become subject to the taxing power of the state; but while remaining the property of the importer, in his warehouse, in the original form or package in which it was imported, a tax upon it is too plainly a duty on imports to escape the prohibition in the Constitution.'' ■ From the date that Johnson-Pickett Rope Company accepted the order of this plaintiff to make the shipments the latter obtained an inchoate title which later ripened into an absolute title. As we understand the law we are not called upon, and do not attempt, to determine the exact date on which plaintiff's title became absolute. That, from and after his order was accepted, he had a property interest in the merchandise is perfectly clear.

■ The question then arises as to what effect, if any, did the execution of the shipping papers hereinabove referred to have on the status of the merchandise as imports. In so far as the record shows we think they had none. Discussing the nature of a conditional sales contract, in *Walker* v. *Houston,* 215 Cal. 742, commencing on page 746 [12 Pac. (2d) 952, 87 A. L. R. 937], the court said: ''The title is reserved for security only. The buyer has the full right of possession and use unless he defaults, and may secure title by performance of his obligation without any further assent by the seller. The sole interest of the seller is in the receipt of the price, and his reserved title cannot be used for any other purpose. Hence it follows that tender of the balance of the price should have the effect of discharging the title of the seller and vesting such title in the buyer, and it has been so held. (*Davies-Overland Co.* v. *Blenkiron,* 71 Cal. App. 690 [236 Pac. 179]; *Dame* v. *C. H. Hanson & Co.,* 212 Mass. 124 [98 N. E. 589, Ann. Cas. 1913C, 329, 40 L. R. A. (N. S.) 873]; *National Cash Register Co.* v. *Wapples,* 52 Wash. 657 [101 Pac. 227].)'' A short time later the same court in the case

of *County of San Diego* v. *Davis,* 1 Cal. (2d) 145 [33 Pac. (2d) 827], was called upon to review the judgment rendered in an action brought to recover a tax that had been levied on an automobile. The automobile was purchased under a conditional sales contract. The buyer took possession, remained in possession and had the beneficial use of the automobile. The county of San Diego claimed the right to recover the tax from the ''legal owner'' as distinguished from the ''regis-- tered owner''. Commencing on page 146 the court said: ''The trial court determined that the registered owner was the party liable for the tax, and that the legal owner was not liable. This holding follows the established practice throughout the state, and is both sound and practical. The imposition of personal liability for the tax on finance companies which have no use or control over the car, instead of on the party having the beneficial use, finds no justification in the statutes. The tax must be levied on the owner of the property, but this does not necessarily mean the holder of the legal title. In a conditional sale, the title in the seller is for security only, to assure the payment of the purchase price. It carries with it none of the ordinary incidents of ownership. The buyer has the possession and use of the property to the complete exclusion of the seller, subject only to the seller's remedies in case of default. Both in a practical and a legal sense the buyer is the beneficial owner. (See *Walker* v. *Houston,* 215 Cal. 742 [12 Pac. (2d) 952, 87 A. L. R. 937].) The precise question at issue in this case was before the Alabama court in *Ex parte State,* 206 Ala. 575 [90 So. 896]. The court there said: ' . . . when a statute requires that property be assessed to the owner, we think it means the general and beneficial owner—that is, the person whose interest is primarily one of possession and enjoyment in the contemplation of an ultimate absolute ownership—and not the person whose interest is primarily in the enforcement of a collateral pecuniary claim, and does not contemplate the use or enjoyment of the property as such.' '' In other words, bearing in mind we are considering the allegations of the plaintiff's complaint as amended, we find nothing to show that the shipping papers contained anything showing that the merchandise ''lost its distinctive character as an import''. It follows that the tax imposed on the merchandise was il-

legally collected and that the plaintiff's complaint stated a cause of action.

The judgment appealed from is affirmed.

Nourse, P. J., and Spence, J., concurred.