[Civ. No. 16460.   Second Dist., Div. Three.   Feb. 4, 1949.]

EXPORT LEAF TOBACCO CO. (a Corporation), Respondent, v. COUNTY OF LOS ANGELES et al., Appellants.

Ray L. Chesebro, City Attorney, Hugh H. MacDonald, Louis A. Babior, Deputy City Attorneys, Harold W. Kennedy, County Counsel and Gordon Boller, Deputy County Counsel, for Appellants.

Flint & MacKay and Roscoe C. Andrews for Respondent.

VALLÉE, J.—Appeal by defendants from a judgment for plaintiff that the defendants shall refund to plaintiff a tax paid on personal property.

The facts as found by the trial court are these:

Plaintiff is a Delaware corporation, with its principal place of business in Richmond, Virginia, and in the fall of 1941 was the owner of 701 hogsheads and 270 cases of leaf tobacco. On November 18, 1941, plaintiff delivered the tobacco to Barber Steamship Lines on the eastern seaboard of the United States for shipment to Hong Kong, China. A part of the tobacco was loaded aboard the vessel "Torrens" at New York. The balance was loaded aboard the "Torrens" at Newport News, Virginia. All of the tobacco was to be discharged at Hong Kong upon acceptance of bills of lading by the consignee.

On December 4, 1941, the "Torrens," carrying the cargo of tobacco on its voyage to Hong Kong, arrived at the Port of Los Angeles and began loading California cargo at Berth

53 on a pier. On December 7, 1941, the "Torrens" was ordered to anchorage by the United States Navy. On December 8, 1941, it left anchorage and returned to Berth 53 to resume loading the California cargo. On December 9, 1941, it finished loading its California cargo and was ordered back to anchorage by the United States Navy. On December 10, 1941, the "Torrens" returned to Berth 53. It was now fully loaded and ready to sail for Hong Kong and the far East. On December 13, 1941, the United States Navy ordered the installation of a degaussing cable (a cable fitted around the hull to neutralize the magnetic field set up by the ship). On that date the vessel started discharging its top deck cargo in order that the cable might be installed. On December 17, 1941, the "Torrens" had completely discharged its top deck cargo. It then proceeded to Bethlehem Ship Yards to have the degaussing cable installed. On January 7, 1942, the "Torrens" was shifted to Berth 228, Terminal Island. On January 8, 1942, pursuant to orders of the United States Navy, it began the discharge of all its cargo. About January 21, 1942, it finished the unloading of the cargo.

None of the tobacco was unloaded from the "Torrens" until after January 8, 1942, and some time before January 21, 1942. It was unloaded in two lots, one lot at Berth 53 and one lot at Berth 228.

On December 7, 1941, and at all times thereafter the bills of lading covering the tobacco had not been accepted by the consignee and the right to control and ownership of the tobacco was in the plaintiff. Plaintiff had no knowledge that it would be impossible for Barber Steamship Lines to carry out the shipment of the tobacco to Hong Kong until about December 19, 1941.

Plaintiff is a nonresident of California. It does not carry on any business therein. It does not have any office or warehouse of any kind in California. At the time the tobacco was unloaded from the "Torrens" in California, plaintiff had no other property of any kind in the state. Immediately upon being advised by Barber Steamship Lines that it would be impossible for that company to carry out the shipment of the cargo to Hong Kong, and prior to the discharge of the tobacco at Los Angeles, plaintiff determined to return the tobacco to Newport News. It immediately began to devise means and ways of doing so. Owing to the outbreak of hostilities with Japan which resulted in governmental restrictions upon the movement of ships, no bottoms were available

within which to return the tobacco to Newport News. The rail rates east in effect at the time were exorbitant and plaintiff immediately began negotiations with the railroad companies to secure a reduction from $3.72 per hundredweight to $1.21 per hundredweight, effective as of March 28, 1942. At no time was it the intention of plaintiff that the tobacco, or any part of it, should come to rest or have a situs in California. The presence of the tobacco in the county of Los Angeles on March 2, 1942 (the first Monday in March), was due solely to the delay in securing shipping facilities to return the tobacco to Newport News.

The tobacco at all times during the period in question had the character of an export and was in foreign commerce within the meaning of article I, section 10, clause 2 (the export-import clause) and article I, section 8, clause 3 (the commerce clause) of the Constitution of the United States and as such was exempt from taxation by the defendants.

As soon as plaintiff was notified, about December 19, 1941, by Barber Steamship Lines that it would be impossible for it to complete the shipment of the tobacco to Hong Kong, and at all times thereafter, it was plaintiff's intention that the tobacco be returned to Newport News.

On March 2, 1942, the Assessor of the County of Los Angeles levied an assessment against the tobacco. The tax levied amounted to $3,030.77. It was paid under protest by plaintiff on June 2, 1942. The tax was erroneously and illegally collected. On March 23, 1945, plaintiff filed a claim for refund pursuant to the Revenue and Taxation Code. The claim was disallowed by the Board of Supervisors of the County of Los Angeles on April 10, 1945.

No advantage or profit resulted to plaintiff from the transaction. On the contrary, the transaction resulted in a substantial detriment to plaintiff in that it caused plaintiff to incur handling, storage and freight charges that would have been avoided if the tobacco had not been warehoused in Los Angeles. Plaintiff acted promptly and reasonably in the light of the facts and circumstances existing at the time in returning the tobacco to Newport News. Plaintiff acted within a reasonable time in returning the tobacco to Newport News. The sole reason for the temporary storage of the tobacco in the county of Los Angeles was due to the intervention of duly constituted governmental authority as a result of wartime conditions, which conditions were unprecedented on the Pacific Coast in the history of our country.

The interruption in the shipment of the tobacco was an involuntary interruption caused by the intervention of duly constituted governmental authority owing to wartime conditions.

The court concluded that the tax was illegally assessed and constituted a regulation of foreign commerce by imposing an impost upon an export within the meaning of the pertinent clauses of the Constitution of the United States. Judgment followed for plaintiff, from which defendants appealed.

Appellants contend that the findings of fact are not supported by the evidence, and that the conclusion of law that the tax was illegally assessed was erroneous. In our opinion the contentions are without merit. The only findings that appellants question are: (1) it was not the intention of plaintiff that the tobacco, or any part thereof, should come to rest or have a situs in California, (2) the presence of the tobacco in the county of Los Angeles on March 2, 1942, was due solely to the delay in securing shipping facilities to return the tobacco to Newport News, (3) the tobacco had the character of an export, was in foreign commerce and as such was exempt from taxation, (4) as soon as plaintiff was notified about December 19, 1941, that it would be impossible for Barber Steamship Lines to complete the shipment of the tobacco to Hong Kong, and at all times thereafter, it was plaintiff's intention that the tobacco should be returned to Newport News, (5) the tax was erroneously and illegally collected, (6) there was no advantage or profit to plaintiff from the transaction, but it resulted in a substantial detriment to plaintiff because it had to incur handling, storage and freight charges that would have been avoided if the tobacco had not been warehoused in Los Angeles, (7) the sole reason for the temporary storage of the tobacco in Los Angeles was due to the intervention of duly constituted governmental authority as a result of wartime conditions, (8) the interruption in the shipment of the tobacco was an involuntary interruption caused by the intervention of duly constituted governmental authority.

The evidence bearing on the questioned findings, stated most favorably to respondent, is as follows:

About November 10, 1941, plaintiff filed shipper's export declarations on the tobacco with the United States Customs Service in which it certified under oath that the consignee of the tobacco was British Cigarette Company, Hong Kong, China; that the destination was Hong Kong; that it was not its intention that any of the tobacco shipped by it on board

the "Torrens" be delivered to other vessels in port or transshipped on the high seas.

On its way from Newport News to Hong Kong the "Torrens" put in at Los Angeles to take on additional cargo. Because of the declaration of war with Japan and orders of the United States Navy and pursuant to authority contained in the bills of lading, the master of the vessel terminated the voyage of the "Torrens" at Los Angeles.

About December 19, 1941, plaintiff learned for the first time that the "Torrens" had put in at Los Angeles and that it was likely that the cargo would be discharged. It immediately determined to return the tobacco to Newport News and began the necessary steps to have it shipped east. Between December 19, 1941, and the early part of January, 1942, plaintiff sought to prevail upon Barber Steamship Lines to return the tobacco to Newport News on one of its eastbound steamers and thus save the necessity of an outlay for domestic rail freight. It was unable to do that as practically all ships had been taken over by the government. At that time there was no favorable eastbound rail freight rate. The westbound rail freight rates were "commodity" rates. Eastbound rail freight rates were only "class" rates and more than three times higher than the westbound rates. In the early part of January, 1942, plaintiff began negotiations with rail carriers in an effort to secure a reduced freight rate to ship the tobacco back to Newport News. It took plaintiff from the middle of January to the middle of March, 1942, to accomplish the reduction in rates. The rates were to become effective March 28, 1942. On January 21, 1942, the "Torrens" completed unloading the tobacco.

Before it could obtain possession of the tobacco respondent was required to secure a complete set of the original bills of lading which were not in its possession and surrender them to Barber and execute a letter of guarantee to Barber; or if it could not obtain possession of a complete set of the original bills of lading to execute a guarantee to Barber, countersigned by an authorized bank, and agree to deliver the bills of lading to Barber as soon as it obtained possession of them; or give Barber a surety bond in an amount twice the value of the tobacco; and, in addition, obtain a release from the Collector of Customs at San Pedro. Respondent did not have an agent in California and all details respecting shipment of the tobacco to Newport News had to be handled through Barber. Much correspondence

and time was required to effect the many details arising out of the turbulence created by the attack on Pearl Harbor, the declaration of war and the demands of the government.

Respondent was advised on January 17, 1942, that before it could obtain possession of the tobacco the government required that it obtain and fill out Form TFER-1 (revised) and sent it to the Federal Reserve Bank in San Francisco in order to obtain a license for delivery of the tobacco and obtain and fill out another form and send it to Barber. Before it learned that the eastbound rate would be reduced, respondent gave Barber specific instructions for shipment of the tobacco to itself at Newport News, giving the names of the railroads, amount to send by each railroad, routing, the amount to be loaded in each car, the size of the cars to be used, a diagram for loading the hogsheads, the weight of each case, how many cases and hogsheads to a car, and other detailed information necessary for the shipment. Twenty-four of the hogsheads, which had been taken on at New York, had been imported from Canada to New York for export to Hong Kong. Respondent was compelled to communicate with the Canadian shipper, learn whether to transship the 24 hogsheads to Canada by way of Newport News or direct, give a separate letter of indemnity and separate forms, and arrange for its shipment in custom bond and seal. There were difficulties in loading cars because of the fact that part of the tobacco had been unloaded at Berth 53 San Pedro and part at Berth 228 Terminal Island. The wharf demurrage period ended on March 29, 1942, and it was necessary to secure a reduction of rates from the Board of Harbor Commissioners of Los Angeles.

Plaintiff did not definitely learn what and how much tobacco was at Berth 53 and what and how much was at Berth 228 until about March 17, 1942. The tobacco was not released to plaintiff until about March 17, 1942. The reduced rate became effective March 28, 1942. Plaintiff made arrangements for all of the tobacco to leave Los Angeles on March 28, 1942, by rail freight for Newport News. The tobacco left Los Angeles for Newport News by rail freight on April 6, 1942. On March 2, 1942 (the first Monday in March), the Assessor of the County of Los Angeles assessed the tobacco as property taxable by the defendants. The delay after March 28 was caused by the fact that the County Assessor of the County of Los Angeles placed a stop order on the shipment of tobacco. The tobacco remained on piers

until it left for Newport News. It was not placed in a public warehouse.

Plaintiff expended $1,175 for storage and handling of the tobacco while it was in California, and $11,349.92 for freight charges from Los Angeles to Newport News. If the shipment had not been discharged at Los Angeles, plaintiff would not have incurred these expenses. Plaintiff saved about $23,500 by securing a reduced rate for shipment of the tobacco from Los Angeles to Newport News. No refund was made by Barber Steamship Lines to plaintiff by reason of its inability to deliver the tobacco to Hong Kong. The tobacco was moved from Los Angeles to Newport News as soon as possible after the reduction in freight rates was effected. Plaintiff at all times after it learned that the tobacco had been unloaded at Los Angeles intended to ship it to Newport News. It did not at any time change its intention. It did not at any time contact anyone "as to purchasing" the tobacco while it was in California.

A preliminary question should first be considered. It is the law, as appellants argue, that where there is no conflict in the evidence on an issue, the finding of the trial court on that issue amounts to a conclusion of law and the finding is not binding on a reviewing court. (*San Diego T. & S. Bank* v. *San Diego County,* 16 Cal.2d 142, 153 [105 P.2d 94, 133 A.L.R. 416]; *Free* v. *Sluss,* 87 Cal.App.2d Supp. 933, 936 [197 P.2d 854].) This rule necessarily means that there must be no conflicting inferences which the trial judge could have drawn from the evidence. (*Nichols* v. *Mitchell,* 32 Cal.2d 598, 606 [197 P.2d 550].) It is the province of the trial court to resolve conflicting inferences. The circumstances as well as direct evidence are to be considered by that court in drawing inferences from the evidence. A finding will not be disturbed on appeal if some substantial evidence or reasonable inference lends support thereto. (*Nichols* v. *Mitchell,* *supra,* pp. 606, 607.) In order that it may be said that there is no conflict in the evidence and that a finding of a trial court is a conclusion of law, appellant must show that no inference can reasonably be drawn from the evidence other than that the taxed tobacco was not in foreign commerce, was not an export, was not in interstate commerce, and that it had its taxable situs in Los Angeles on March 2, 1942.

Article I, section 8, clause 3 of the Constitution of the United States provides that the Congress shall have power "(3) To regulate commerce with foreign nations, and among

the several states. . . ." Article I, section 10, clause 2 reads: "No State shall, without the consent of the Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws; . . ." The distinction between these provisions of the Constitution was pointed out in *Richfield Oil Corp.* v. *State Board of Eq.*, 329 U.S. 69 [67 S.Ct. 156, 91 L.Ed. 80], as follows, page 88 [91 L.Ed.]: "The two constitutional provisions, while related, are not coterminous. To be sure, a state tax has at times been held unconstitutional, both under the Import-Export Clause and under the Commerce Clause. *Brown* v. *Maryland*, 12 Wheat. (US) 419, 6 L ed 678; *Crew Levick Co.* v. *Pennsylvania*, 245 US 292, 62 L ed 295, 38 S Ct 126. But there are important differences between the two. The invalidity of one derives from the prohibition of taxation on the import or export; the validity of the other turns nowise on whether the article was, or had ever been, an import or export. See *Hooven & A. Co.* v. *Evatt*, 324 US 652, 665, 666, 89 L ed 1252, 1263, 1264, 65 S Ct 870, and cases cited. Moreover, the Commerce Clause is cast, not in terms of a prohibition against taxes, but in terms of a power on the part of Congress to regulate commerce. It is well established that the Commerce Clause is a limitation upon the power of the States, even in absence of action by Congress. *Southern P. Co.* v. *Arizona*, 325 US 761, 89 L ed 1915, 65 S Ct 1515; *Morgan* v. *Virginia*, 328 US 373, 90 L ed 1317, 66 S Ct 1050, 165 ALR 574." ■ The commerce clause "by its own force created an area of trade free from interference by the States." (*Freeman* v. *Hewit*, 329 U.S. 249 [67 S.Ct. 274, 91 L.Ed 265].) It covers both interstate and foreign commerce. (*Joseph* v. *Carter & Weekes S. Co.*, 330 U.S. 422 [67 S.Ct. 817, 91 L.Ed 993].) ■ A state cannot tax interstate or foreign commerce. (*Cooney* v. *Mountain States Teleph. & Teleg. Co.*, 294 U.S. 384 [55 S.Ct. 477, 79 L.Ed. 934, 941]; *Crew Levick Co.* v. *Pennsylvania*, 245 U.S. 292 [38 S.Ct. 136, 62 L.Ed. 295, 299].) Whether the exercise of the taxing power of a state is forbidden in a particular case is to be determined by the practical operation of the state statute as applied to the facts of that case. (*Hughes Bros. Timber Co.* v. *Minnesota*, 272 U.S. 469 [47 S.Ct. 170, 71 L.Ed. 359].)

Where foreign or interstate commerce is involved, the Supreme Court of the United States in many cases has enunciated the rule that where goods are in transit in foreign or

interstate commerce they are not subject to tax by jurisdictions through which they pass on their foreign or interstate journey. (*Rhodes* v. *State of Iowa,* 170 U.S. 412 [18 S.Ct. 664, 42 L.Ed. 1088]; *Southern P. Terminal Co.* v. *Interstate Commerce Com.,* 219 U.S. 498 [31 S.Ct. 279, 55 L.Ed. 310]; *Texas & N. O. R. Co.* v. *Sabine Tram Co.,* 227 U.S. 111 [33 S.Ct. 229, 57 L.Ed. 442]; *Bacon* v. *Illinois,* 227 U.S. 504 [33 S.Ct. 299, 57 L.Ed. 615]; anno. 171 A.L.R. 284.) The present case must be decided in view of governmental war emergency measures. That fact primarily marks the line of distinction between this case and nearly all other cases cited in appellants' briefs. In the examination of the cases to follow it will be observed that they evidence a strong tendency to protect foreign and interstate commerce from encroachments of state governments.

Ordinarily foreign or interstate transportation ends when the article reaches its destination. (*United States* v. *Freeman,* 239 U.S. 117 [36 S.Ct. 32, 60 L.Ed. 172, 174]; *Danciger* v. *Cooley,* 248 U.S. 319 [39 S.Ct. 119, 63 L.Ed. 266, 268].) The basic issue with respect to the taxability of the tobacco is whether its delay in Los Angeles constituted such a break in its foreign or interstate transit as to remove it from the protection of the commerce clause. (*Von Hamm-Young Co.* v. *San Francicso,* 29 Cal.2d 798, 802 [178 P.2d 745, 171 A.L.R. 274].) The crucial question in determining whether the state's taxing power may be exerted is that of "continuity of transit." (*Carson Petroleum Co.* v. *Vial,* 279 U.S. 95 [49 S.Ct. 292, 73 L.Ed. 626].) It is: Why was the tobacco in Los Angeles? (*Von Hamm-Young Co.* v. *San Francisco, supra,* p. 804.) In the latter case the court stated, page 802: " 'Formalities such as the forms of billing and mere changes in the method of transportation do not affect the continuity of the transit. The question is always one of substance and in any particular case it is necessary to consider the particular occasion or purpose of the interruption during which the tax is sought to be levied.' " In the Von Hamm case, where goods, shipped to San Francisco from various parts of the country with their destination Hawaii, were warehoused in San Francisco awaiting cargo space for Hawaii, the court said, pages 802, 803: "If the break in interstate transit is merely incident to the interstate journey, such as a breakdown in the transportation system (*Champlain Realty Co.* v. *Brattleboro,* 260 U.S. 366 [43 S.Ct. 146, 67 L.Ed 309]), or a delay to promote the safe or convenient transit of the

property (*Champlain Realty Co.* v. *Brattleboro, supra; Kelley* v. *Rhoads,* 188 U.S. 1 [23 S.Ct. 259, 47 L.Ed 359]), to await ships, or to permit accumulation of sufficient cargo to load a ship (*Carson Petroleum Co.* v. *Vial,* 279 U.S. 95 [49 S.Ct. 292, 73 L.Ed. 626]), the property remains immune from local taxation." In *Carson Petroleum Co.* v. *Vial,* 279 U.S. 95 [49 S.Ct. 292, 73 L.Ed. 626], the Supreme Court of the United States said, page 630 [73 L.Ed.]: "There has been a liberal construction of what is continuity of the journey, in cases where the court finds from the circumstances that export trade has been actually intended and carried through."

The leading case is *Coe* v. *Errol,* 116 U.S. 517 [6 S.Ct. 475, 29 L.Ed. 715]. In that case two lots of floating logs were involved. One lot was cut in Maine and floated down the Androscoggin River on its journey to Lewiston, Maine. On its way the Androscoggin runs from Maine into New Hampshire and back into Maine. After starting on their voyage the logs were detained for a season in New Hampshire by low waters. It was held that the logs were not taxable in New Hampshire because they had begun the interstate trip and the cause of the detention was in the necessities of the passage and the trip back to Maine, which was held to be continuous. As to the other lot, the court found that the logs were gathered in New Hampshire but when taxed had not started on their interstate journey. In *Kelley* v. *Rhoads,* 188 U.S. 1 [23 S.Ct. 259, 47 L.Ed. 359], a herd of about 10,000 sheep was driven from Utah through Wyoming to Nebraska. In going through Wyoming, the sheep were permitted to spread out at times in the neighborhood of a quarter of a mile and to graze over land of that width. They were maintained by grazing along the route of travel. For the purpose of shipping the sheep it was not necessary that they be driven into Wyoming. They could have been shipped by rail. The sheep were held exempt from local taxation in Wyoming, the court saying, page 363 [47 L.Ed.]: "It is true that the sheep might have been transported by rail from Utah to Pine Bluffs, but the statement fails to show whether that course would have been more or less expensive than the one adopted. It is clear that the owner had the right to avail himself of such means of transportation as he preferred, and in estimating the probable cost he was at liberty to consider the fact that he was licensed to make use of the public lands of the United States, without charge, for the sustenance of his sheep. *Buford* v.

*Houtz,* 133 U.S. 320, 33 L.Ed. 618, 10 S.Ct. 305. . . . the owner or his shepherd was at liberty to choose his own method of transportation. . .''

In *Southern P. Terminal Co.* v. *Interstate Commerce Com.,* 219 U.S. 498 [31 S.Ct. 279, 55 L.Ed. 310], cotton oil cake and meal were purchased by the intending exporter in Texas, Oklahoma, and Louisiana. It was shipped to him on bills of lading and waybills showing the destination as Galveston. The purchases were made for export. There was no consumption in Galveston. When the cake reached Galveston, it was ground into meal and sacked by the exporter. The court held, page 320 [55 L.Ed.]: ''. . . the manufacture or concentration on the wharves of the terminal company are but incidents, under the circumstances presented by the record, in the transshipment of the products in export trade, and their regulation is within the power of the Interstate Commerce Commission.'' In *Railroad Commission* v. *Worthington,* 225 U.S. 101 [32 S.Ct. 653, 56 L.Ed. 1004], coal from Ohio mines was shipped by rail to Huron, Ohio, on Lake Erie, for transshipment out of Ohio. The shipper transported the coal on bills of lading to himself at Huron. When it was shipped it was not known in what vessel it would be loaded, nor to what particular ultimate destination it would go; and sometimes the coal was sold and vessels arranged for after it arrived at Huron. The coal remained on the cars until unloaded into a vessel for transshipment out of Ohio. The coal was accumulated in large quantities at Huron and only taken out of the accumulated lots from time to time when it was to be put on vessels and shipped out of the state. The court held that the coal at all times after shipment at the mines was in ''interstate, and necessarily as well in foreign, commerce.'' To the same effect, *Texas & N. O. R. Co.* v. *Sabine Tram Co.,* 227 U.S. 111 [33 S.Ct. 229, 57 L.Ed. 442].

In *Champlain Realty Co.* v. *Brattleboro,* 260 U.S. 366 [43 S.Ct. 146, 67 L.Ed. 309, 25 A.L.R. 1195], logs destined for New Hampshire were held in Vermont as a substitute for more costly terminal facilities in New Hampshire. The taxpayer deliberately prepared for storage of the logs in Vermont because sending them on their journey would result in more costly terminal facilities in New Hampshire. The logs could have continued their journey without delay had the boom in New Hampshire been stronger or other facilities provided to receive the logs. It was held that the logs were immune from local taxation in Vermont. In the course of

the opinion, Mr. Chief Justice Taft stated, page 314 [67 L.Ed.] : "If the interruptions are only to promote the safe or convenient transit, then the continuity of the interstate trip is not broken. [Citations] . . . In other words, in such cases interstate continuity of transit is to be determined by a consideration of the various factors of the situation. Chief among these are the intention of the owner, the control he retains to change destination, the agency by which the transit is effected, the actual continuity of the transportation, and the occasion or purpose of the interruption during which the tax is sought to be levied." In *Board of Trade* v. *Olsen*, 262 U.S. 1 [43 S.Ct. 470, 67 L.Ed. 839], it was held that the fact that grain shipped from out of Illinois into Chicago, was there stored in warehouses, inspected, weighed, graded, mixed with other grain, changed ownership, consignee, or destination, did not take it out of interstate commerce.

*Hughes Bros. Timber Co.* v. *Minnesota*, 272 U.S. 469 [47 S. Ct. 170, 71 L.Ed. 359], held that the interstate journey of logs began when the ice broke and they began to move down the river rather than at booms where they were loaded on vessels for further journey, the court saying, page 362 [71 L.Ed.] : "The mere power of the owner to divert the shipment already started does not take it out of interstate commerce if the other facts show that the journey has already begun in good faith and temporary interruption of the passage is reasonable and in furtherance of the intended transportation, as in the Champlain Co. Case [260 U.S. 366, 67 L.Ed. 309, 43 S.Ct. 146, 25 A.L.R. 1195]."

In *Carson Petroleum Co.* v. *Vial*, 279 U.S. 95 [49 S.Ct 292, 73 L.Ed. 626], oil was shipped from Kansas, Oklahoma, and Texas into Louisiana and there held in storage awaiting either the arrival of ships or the accumulation of a sufficient quantity to load a ship. The oil while in storage in Louisiana was held clear of local taxation on the ground that the storage was incidental to the transit of the oil through the state. In *Minnesota* v. *Blasius*, 290 U.S. 1 [54 S.Ct. 34, 78 L.Ed. 131], it was said, page 136 [78 L.Ed.] : "If the interstate movement has begun, it may be regarded as continuing, so as to maintain the immunity of the property from state taxation, despite temporary interruptions due to the necessities of the journey or for the purpose of safety and convenience in the course of the movement."

In *State* v. *Engle*, 34 N.J.L. 425, coal shipped from Pennsylvania to a New Jersey port, where it was separated and

sorted according to its different sizes, for shipment by water to other markets and when a cargo of one size was obtained, then was shipped as soon as a vessel could be chartered to carry it, was held in commerce and not taxable in New Jersey, the court saying, page 427: ''Delay within the state, which is no longer than is necessary for the convenience of trans-shipment for its transportation to its destination, will not make it property within the state for the purposes of taxation.'' To the same effect: *State* v. *Carrigan,* 39 N.J.L. 35. These New Jersey cases were cited with approval in *Carson Petroleum Co.* v. *Vial, supra.*

In *Philippine Ref. Corp.* v. *Contra Costa County,* 24 Cal. App.2d 665 [76 P.2d 163], a New Yorker imported cocoanut oil from the Philippines. The importer aggregated orders sufficient to. fill a tank or tanks in a steamer. When the oil arrived at Point San Pablo in California, it was placed in temporary storage facilities for transshipment, from which it was taken and delivered in agreed smaller quantities to buyers throughout the United States, pursuant to orders theretofore made. The oil could not be economically imported in the small quantities delivered to the buyers and could only be economically imported in steamer tanks. It was neither practical nor according to business custom to make shipment in segregated lots to each individual customer at the times and the amounts called for by the contracts of the purchasers. It was held that the halt in California was solely for a purpose incidental to the transportation and that the oil while halted was not subject to tax by Contra Costa County. (See, also, *Western Oil Refining Co.* v. *Lipscomb,* 244 U.S. 346 [37 S.Ct. 623, 61 L.Ed. 1181]; *United States* v. *Erie R. Co.,* 280 U.S. 98 [50 S.Ct. 51, 74 L.Ed. 187]; *Johnson* v. *County of Los Angeles,* 31 Cal.App.2d 579 [88 P.2d 725]; *Imperial Development Co.* v. *Calexico,* 47 Cal.App. 666 [191 P. 50]; *W. J. Lake & Co., Inc.* v. *King County,* 3 Wn.2d 500 [101 P.2d 357], cert. den. 311 U.S. 715 [61 S.Ct. 396, 85 L.Ed. 465]; *Galveston* v. *Mexican Petroleum Corp.,* 15 F.2d 208; *Southern Pac. Co.* v. *Calexico,* 288 F. 634; *In re Taxes, Pacific Guano & Fertilizer Co.,* 32 Hawaii 431; *State* v. *Hammermill Paper Co.,* 149 Minn. 414 [184 N.W. 182]; *Connecticut River Lumber Co.* v. *Columbia,* 62 N.H. 286; *Borough of Edgewater* v. *Department of Tax. & F.,* 135 N.J.L. 42 [50 A.2d 103]; *State* v. *Empire Oil & Refining Co.,* 171 Okla. 138 [42 P.2d 127]; *Clark* v. *Atlantic Pipe Line Co.* (Tex.Civ.App.), 134 S.W.2d 322; *West Virginia*

*Pipe Line Co.* v. *State*, 95 W.Va. 285 [120 S.E. 759]; anno. 60 A.L.R. 1465; 155 A.L.R. 936.)

The cases in which the Supreme Court of the United States has upheld the imposition of a property tax were cases in which: there was a halt to process the goods (*Bacon* v. *Illinois*, 227 U.S. 504 [33 S.Ct. 299, 57 L.Ed. 615]); the interruption was to hold the goods for sale (*Minnesota* v. *Blasius*, 290 U.S. 1 [54 S.Ct. 34, 78 L.Ed. 131]); the interruption was not in necessary delay or accommodation to the means of transportation (*General Oil Co.* v. *Crain*, 209 U.S. 311 [28 S.Ct. 475, 52 L.Ed. 754]); the interruption was to separate the goods for distribution to customers and to place them in different containers (*General Oil Co.* v. *Crain, supra*); a stock of goods was accumulated to enable the owner to fill orders more readily (*Susquehanna Coal Co.* v. *South Amboy*, 228 U.S. 665 [33 S.Ct. 712, 57 L.Ed. 1015]); coal shipped into the taxing state was stored there until sold within the state (*Pittsburgh & S. Coal Co.* v. *Bates*, 156 U.S. 577 [15 S.Ct. 415, 39 L.Ed. 538]); gasoline shipped into the taxing state was stored there until used by taxpayer in the operation of its bleachery (*Gregg Dyeing Co.* v. *Query*, 286 U.S. 472 [52 S.Ct. 631, 76 L.Ed. 1232, 84 A.L.R. 831]); machinery and supplies shipped into the taxing state were used or consumed in the construction of a dam located therein (*Henneford* v. *Silas Mason Co.*, 300 U.S. 577 [57 S.Ct. 524, 81 L.Ed. 814]); coal shipped into the taxing state was stored, when point or person to whom it would finally be sent or the use to which it would be put were unknown, and until after storage it could not be known whether the coal would move interstate or intrastate, and the goods which were sent initially into the interstate commerce stream were not identical goods which finally arrived at the place of consumption (*Independent Warehouses, Inc.* v. *Scheele*, 331 U.S. 70 [67 S.Ct. 1062, 91 L.Ed. 1346]); and in this state, the container or original package used in the transportation of an import was opened and smaller packages removed therefrom were offered for sale in the taxing state, or the recipient in the taxing state had an unexecuted intention to open the package and sell its contents (*E. J. Stanton & Sons* v. *County of L. A.*, 78 Cal.App.2d 181 [177 P.2d 804]). (See *Von Hamm-Young Co.* v. *San Francisco*, 29 Cal.2d 798, 803 [178 P.2d 745, 171 A.L.R. 274].) In *Empresa Siderurgica* v. *County of Merced*, 32 Cal.2d 68 [194 P.2d 527], it was held that the mere intention to and preparation for export did not give property the status of an export.

■ The cases clearly point to the conclusion that whether taxes may be imposed locally depends upon the character and kind of commodity, the original intention of the owner, whether the intention changed, the continuity of transit, the control the owner retains to change the destination, the purpose and cause of an interruption—whether voluntary or involuntary, the length of the interruption, and whether the interruption results in profit or loss to the owner. No one of the requisites standing alone would necessarily determine the question. All of the facts must be considered in determining the essential factual question of whether or not the goods are in transit. An involuntary interruption, particularly one caused by war conditions, should not change the legal aspect of the commodity.

■ The findings of the trial court, supported by ample evidence, sustained its conclusion that the tobacco was in transit in foreign and interstate commerce on March 2, 1942, when appellants attempted to levy the property tax. Here we have the intention to ship to Hong Kong put into accomplishment by an actual continuous journey, with an involuntary stoppage in the course of the journey to save the tobacco from loss, and only for that purpose. The destination of the tobacco was fixed and certain. Respondent did not remove the tobacco from the ''Torrens.'' It did not halt its journey. The tobacco was merely held temporarily in Los Angeles until reasonable rail freight transportation was available. While in Los Angeles the tobacco had not reached its destination. Its journey was to Hong Kong. The war broke that journey. It was then transshipped to Newport News as soon as convenient transportation could be arranged. The intention, at all times, after the break in the journey was to transship to Newport News. The break was merely incident to its journey. The detention was solely in the necessities of the passage. (*Coe* v. *Errol, supra,* 116 U.S. 517 [6 S.Ct. 475, 29 L.Ed. 715].) Respondent had the right to avail itself of such means of transportation as it preferred, and in doing so to estimate and select the least expensive means. (*Kelley* v. *Rhoads, supra,* 188 U.S. 1 [23 S.Ct. 259, 47 L.Ed. 359]; *Champlain Realty Co.* v. *Brattleboro, supra,* 260 U.S. 366 [43 S.Ct. 146, 67 S.Ct. 309, 25 A.L.R. 1195].) The delay was no longer than was necessary ''for the convenience of trans-shipment for its transportation to its destination.'' (*State* v. *Engle, supra,* 34 N.J.L. 425, 427.) None of the tobacco was held or detained in Los Angeles for any purpose

other than shipment to Newport News. Los Angeles was simply a harbor of refuge from danger to a shipment on its way. The warehouses in Los Angeles were not depots for keeping the tobacco for the business purposes of respondent. The interruption in the journey did not occur for purposes connected with the business convenience or profit of respondent. The delay was not for the purpose of use of the property in any fashion by respondent in California. The tobacco never became commingled with the mass of property in this state. The journey did not terminate in Los Angeles. It was simply interrupted. The tobacco was in transit in foreign commerce and was halted only temporarily at Los Angeles and had no situs on March 2, 1942, in the county or state. The delay, even assuming it was caused solely by respondent's desire to obtain lower freight rates east, did not give the tobacco a situs in Los Angeles any more than did "manufacture or concentration on the wharves," or holding a car until a vessel arrived, or accumulating a large quantity of a commodity for transshipment of small lots, or accumulation of small lots for transshipment of a large lot, give the property a situs in the taxing state in the cases we have referred to. It is obvious that respondent suffered a substantial detriment by reason of the break in the journey. It expended in excess of $12,000 which it would not have had to expend had the voyage to Hong Kong continued. The freight it paid for transport of the tobacco from New York and Newport News to Hong Kong was a complete loss.

We cannot infer, as appellants argue, that "plaintiff planned *not* to ship the tobacco to Newport News unless the reduced rate should be adopted and published," or that "any return of the tobacco to the east . . . was entirely dependent upon such cut in freight rates." The trial judge inferred to the contrary, the evidence abundantly supports the inference he drew, and his deduction is conclusive on appeal. Neither can we say, as a matter of law, that the reduction in freight rates "produced plaintiff's decision to ship its tobacco to the east coast." The record is replete with evidence that immediately upon learning that the "Torrens" was going to unload at San Pedro, plaintiff determined to have the tobacco shipped to Newport News, and that it never wavered in its determination so to do. Appellants concede that as a result of the outbreak of hostilities and the declaration of war with Japan, the governmental authorities "assumed control with respect to or limited the

movements of the 'Torrens,' " and that "the outbreak of war occasioned the unfortunate situation which blocked plaintiff's tobacco from the Hong Kong market." The tobacco was concededly in foreign commerce before its discharge at Los Angeles. Whether the interruption in Los Angeles before shipment to Newport News was an interruption in the continuity of transit is a question of fact. Whether respondent was responsible for or acquiesced in an undue delay is a question of fact. The trial judge has stated his conclusion. This court cannot, as a matter of law, determine the contrary.

We conclude that the tobacco was in the course of a foreign and interstate movement and in transit on the taxing date, and that it was not legally assessable or taxable by appellants by virtue of the provisions of the Constitution of the United States.

Judgment affirmed.

Shinn, P. J., and Wood, J., concurred.

# MEMORANDUM CASE