**RICHMAN et al. v. JORAY CORP.**

No. 6318.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 15, 1951.

Decided Nov. 29, 1951.

Thos. W. Johnson, Macon, Ga., for appellant.

A. R. Lawton, Griffin B. Bell, Savannah, Ga., for appellee.

Before McCORD, RUSSELL and RIVES, Circuit Judges.

John W. Thomas, Jr., Columbia, S. C. (Thomas, Cain & Nettles, Columbia, S. C., on the brief), for appellants.

Henry H. Edens, Columbia, S. C. (Henry Hammer, Columbia, S. C., on the brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This action was brought, as will appear from our opinion on the prior appeal, 4 cir., 183 F.2d 667, to recover the sum of $7,930 which the Joray Corporation claimed to be the balance due from the sum of $10,000 deposited by it as security for the performance of its obligations as lessee of a bowling alley and building in Columbia, South Carolina. Harry Richman and Capitol Amusement Company, lessors, denied liability and filed a counterclaim for damages to bowling equipment caused by the lessee. The lease called for a term beginning October 1, 1944 and ending March 31, 1954 at an annual rental of $12,420 and gave the lessee an option to buy the bowling equipment for $14,000 at the termination of the lease in 1954. On June 30, 1949 the tenant, being in default in the payment of rent for the months of May and June, 1949 in the aggregate sum of $2,070, and unable to meet its continuing obligations, surrendered the premises to the lessors under a written contract of settlement wherein it was agreed that the tenant released the lessors from all claims except any claim which it might have to the security deposit of $10,000, and that the lessors did not release the tenant from any claims of any nature, and in particular any claims arising out of the breach of the lease.

In pursuance of the agreement of settlement the lessors took possession of the property, employed a manager and kept the alleys in operation and visited and communicated with bowling alley operators in ten cities, and advertised the property extensively for sale or lease in a number of newspapers, and were finally able on September 12, 1949 to secure a new tenant at the annual rental of $10,000 for a term of two years ending September 11, 1951, with an option on the part of the tenant to continue the lease for an additional period of eight years by notice to be given on or before May 1, 1950. This lease, however, contained no option to purchase.

Under these circumstances, it is evident that the lessors suffered a substantial loss of rent. The lessee, however, contended that although it was liable for defaults prior to the cancellation of the lease by the agreement of June 30, 1949 it was absolved by that agreement from all obligations which thereafter accrued. The District Judge adopted this view and restricted the application of the security deposit to the defaults in rent in the sum of $2,070 plus $200 for damages to the property by the tenant, and rendered judgment for the tenant in the sum of $7,730.

Upon appeal we concluded, for the reasons set out in our opinion, that this position should not be sustained and remanded the case so that the District Court might ascertain the damages, present and prospective, suffered by the lessors, to be measured by the difference between the rent fixed in the lease and the rental value of the premises for the entire term at the time of the breach, together with such special damages as may have resulted from the breach. At the new trial it was stipulated that the damages to the equipment caused by the lessee amounted to $200; and the lessors added to their counterclaim, with the consent of the

lessee, a claim for $11,495 for loss of rental for the period July 1, 1949 to March 31, 1954. Additional evidence to that given at the first trial was taken and upon the whole record the District Judge found that the lessors had not suffered any damages from the termination of the lease agreement other than the sum of $200 above mentioned, and again gave judgment for the lessee in the sum of $7,730.

This conclusion was based upon the finding that on July 1, 1949, when the building and bowling alleys were surrendered to the lessors, the rental value thereof was $13,200, that is to say, $7,200 for the building and $6,000 for the bowling alleys and equipment; and upon the further finding that the bowling alleys and equipment will be worth $30,000 in 1954; and hence it is now contended that since the rental value of the property in 1949 exceeded the rent named in the lease, and since the prospective value of the bowling alleys in 1954 exceeded the price specified in the option given to the lessee to purchase the alleys, the lessors suffered no loss from the default of the lessee in that year.

The evidence offered in support of this view of the case consists of estimates of value by witnesses for the lessee. A rental value of $7,200 per annum for the building was estimated by a prominent real estate broker, who had had twenty-five years' experience in Columbia, and was conceded to be a qualified expert in this field. His opinion may fairly be assumed to be correct since it related to a familiar kind of property whose value can be approximated with reasonable certainty. The rental value of the bowling alleys in 1949 and their sales value in 1954 were estimated by two witnesses who had had experience in operating a bowling alley establishment in Columbia but had had no experience in buying or selling used alleys.

If attention is confined to these estimates, support may be found for the judgment, but when the undisputed facts are taken into consideration, it is obvious that the judgment cannot be sustained. Despite earnest and persistent efforts on the part of the lessors to secure a new tenant, meanwhile keeping the business in operation on their own account, they were unable to rent the place for more than $10,000 per year, and the new tenant, despite the substantially lower rent, did not deem it worth while to avail himself of the option to extend the lease at the same rental for an additional term of eight years as he had the right to do under his lease.

These circumstances demonstrate that the annual rental value of the alleys in 1949 was not $6,000 but was actually less than half this sum, as is apparent when the rental value of the building, shown to be $7,200, is deducted from the total rent of $10,000 which the lessors were finally obliged to accept. We are forced to conclude that the rent paid by the new tenant rather than the estimates of witnesses should govern the decision of the case.

The same course of reasoning compels the rejection of the opinion of the bowling alley men that the alleys will be worth $30,000 in 1954 and hence the lessors saved $16,000 by omitting from the new lease the option to purchase them in that year for $14,000. It is manifest, in the first place, that the market value and rental value of the property are closely related and that the faulty estimate of the rental value vitiates the opinion of the witnesses in the related matter. It is, moreover, demonstrable that the opinion of the witnesses in this respect fails to withstand the assault of the actual facts. The equipment was bought for $65,000 in 1941 but in 1954 it will have been in constant use for thirteen years. In 1944 the parties to the original lease fixed the prospective sales value in 1954 at $14,000, when they were dealing at arms' length, and the owners had no reason to fix the price at less than it would be reasonably worth ten years hence. In 1949 the lessee obviously did not believe that it was surrendering a valuable right, and although some effort was put forth on its behalf, no one was forthcoming to assume its obligations under the lease. In this connection it should be borne in mind that business conditions were much less favorable in 1949 than they had been in 1944 for in the meantime the number of patrons had been curtailed by the reduction in the size of the army post at Fort Jackson, South Carolina,

in the spring of 1949. In other words, the value to be placed upon the building equipment in 1949 by an experienced observer was less than would have seemed reasonable in 1944.

Striking corroboration for this view of the evidence is found in the testimony of the new lessee who operated the alleys in 1949 to 1951 and had no interest in the litigation. He had had more than ten years' experience as the owner and operator of bowling alleys and was conducting the business not only in the alleys in question in Columbia, but also in alleys at Wilmington and at Durham, North Carolina. He was the only witness who had actual experience in the purchase of used alleys. He had actually bought such second hand equipment, equal to those in suit, for $500 to $600 a piece, and had installed them in Wilmington. His evidence further shows that used alleys were constantly advertised and offered for sale at these prices. This testimony explains the willingness of the original lessee to surrender the lease, and its inability to secure any one to take the lease off its hands; and it also shows that the option price of $14,000, that is, $700 a piece for twenty alleys, was a reasonable estimate of their future worth.

It must not be overlooked that the option price of $14,000 contained in the original lease did not include the privilege of operating the alleys in a going business protected by lease on the building for a term of years. The option, if exercised, gave the lessee only the right to take up the alleys after a continuous use of thirteen years, and to install them elsewhere if a suitable location could be found.[1]

We are unable to reach any other conclusion than that the losses of the lessors by breach of the lease must be measured by the difference between the agreed rental of $12,420 per annum and $10,000 the actual rental value in 1949 as established by the acts of the parties when the breach occurred. The difference in these figures for the four years and nine months of the term of the original lease remaining after the surrender on July 1, 1949, amounts to the sum of $11,495 to which should be added the sum of $2,070 for the arrearages of rent in May and June, 1949, and the additional sum of $200 for the amount of the damages to the property caused by the acts of the lessee, making a total of $13,765.

This sum must be modified by the addition of interest from and after July 1, 1949 to the date of the judgment on the difference between the monthly installments of rent specified in the original lease and the rental value in 1949; and deduction must be made with respect to the payments due after the date of the judgment for the earning value of money to be calculated at the same rate as the interest allowed on past due payments. From this final sum should be deducted the sum of $10,000 deposited as security for the performance of the lessee's obligations, and judgment for the balance should be entered for the lessors on their counterclaim. These deductions are made in accordance with the rule that recovery from anticipatory breaches of contract must be rendered under the "present worth" doctrine because the judgment requires them to be paid before the payments accrued.[2] See Chesapeake & Ohio R. Co. v. Kelly, Adm'x, 241 U.S. 485, 491, 36 S.Ct. 630, 60 L.Ed. 1117; Islesworth Hotel Co. v. Ward, 3 Cir., 270 F. 86; Aetna Life Ins. Co. v. Geher, 9 Cir., 50 F.2d 657; Wilkinson v. Dunbar, 149 N.C. 20, 62 S.E. 748, 751; 5 Williston on Contracts § 1358; 5 Sutherland, Law of Damages (4 Ed. 1916) § 1333; McCormick on Damages, pp. 225, 589, 590.

The judgment of the District Court must therefore be reversed with directions to en-

---

1. The opinion of Richman that the alleys were worth $30,000 to $35,000 in 1949 was expressly based on the profit to be derived from their operation in place under good management.

2. Interest is not payable on the arrearages of rent aggregating $2,070 for May and June, 1949, because it was conceded that these sums were due when the agreement of settlement was made on July 1, 1949 and the lessors had the right at that time to apply the deposit of $10,000 pro tanto to the payment of the debt. The right to use the deposit to offset subsequent losses was, however, disputed.

ter a judgment in favor of the lessors on the counterclaim in accord with this opinion.

Reversed and remanded.