[Civ. No. 12124. Third Dist. Sept. 3, 1970.]

DAUM DEVELOPMENT CORPORATION et al.,
Plaintiffs and Respondents, v.
YUBA PLAZA, INC., et al., Defendants and Appellants.

## COUNSEL

Laughlin, Craig & Christensen and Robert E. Laughlin for Defendants and Appellants.

Steel & Arostegui, Albert Arostegui and Tim Evans for Plaintiffs and Respondents.

## OPINION

JANES, J.—Defendants appeal from a judgment in the principal sum of $34,924.50 entered against them in favor of plaintiff Daum Development Corporation (hereinafter, "DDC") on its first cause of action for anticipatory breach of a written agency contract.

The individual coplaintiff (Harry Daum) did not appeal from that portion of the judgment which denied him any recovery. The matter was tried by the court upon plaintiffs' third amended complaint, which also alleged a second cause of action in quantum meruit and a count for ordinary (nonanticipatory) breach of contract. DDC did not recover under either of those additional counts and did not cross-appeal. In its respondent's brief, DDC has acknowledged that "a dismissal" should be entered as to defendant Babu Kahn—i.e., the judgment may be reversed with direction to dismiss as to him—because he died prior to trial and a claim was not timely filed by plaintiffs in his estate proceeding.

On September 21, 1960, DDC and defendant Yuba Plaza, Inc. (hereinafter, "Yuba"), entered into a written contract whereby DDC was to act as Yuba's exclusive agent in the negotiation and procurement of, *first,* long-term leases of commercial sites in Yuba Plaza Shopping Center, a new development on property owned by the individual defendants, who were Yuba's shareholders, and, *second,* a long-term loan which would provide 100 percent financing for the construction of the shopping center.

Under the contract, DDC was to receive a commission for obtaining leases,[1] such commission for any one lease to be a sum equal to 2½ percent of the total guaranteed minimum annual rental provided for in the lease, multiplied times the number of years of the term of the lease. Yuba's obligation to pay such commission for any one lease was conditioned upon Yuba's ability to obtain both a construction loan and the long-term loan, whether procured by DDC or not, and upon the accrual of Yuba's right to payment of the first rental payment under such lease. Other relevant provisions of the contract required Yuba, under certain conditions, to pay each leasing commission in 10 equal annual installments, with 5 percent interest per annum commencing upon the date that Yuba's right to collect the first rental installment under such lease accrued. Under other conditions, the leasing commission was payable either in a lump sum or by a combination of lump sum and installment payments.[2]

The contract further stated, in effect, that DDC would be Yuba's exclusive leasing agent during the *12 months* commencing September 21, 1960 (the date of the contract), and that DDC would be Yuba's exclusive agent for *15 months* after the contract date for the purpose of procuring a written commitment for the long-term loan. The contract did not make DDC's entitlement to leasing commissions dependent upon its success in procuring that loan for Yuba. DDC agreed, however, "to diligently exert its best efforts . . . to obtain . . . such long term loan and leases," and further promised "not to concern itself in any way . . . with the promotion of financing or leases for any other shopping center" in the same area during the continuance of the contract.

---

[1] The "finder's commission" payable to DDC if it procured a long-term loan was waived by plaintiffs at trial and is not involved in this appeal.

[2] In this respect, the contract provided: "Said 2½ % commission for obtaining such leases shall be payable as follows: to the extent that the proceeds of said long term loan shall exceed the cost and expense of constructing said shopping center and of paying Agent its finder's commission [see fn. 1, *supra*], said excess shall be paid to Agent on account of said commission for obtaining said leases (hereinafter referred to as 'lease commission') upon receipt thereof by Yuba from lender, if Yuba's right to payment of the first installment of rent under such lease has then accrued, or if right to payment of rent has not then accured [*sic*], then upon the accrual of such right; or, in the event that the proceeds of said long term loan shall not exceed the total cost and expense of constructing said shopping center and paying Agent's finding commission, or to the extend [*sic*] that Agent's leasing commission remains unpaid after applying the excess of such loan proceeds toward the payment of such leasing commission, then said leasing commission, or the balance thereof, shall be paid to Agent in ten equal annual installments, with interest at five per cent (5%) per annum commencing upon the date that Yuba's right to collect the first rental installment under such lease shall accrue; provided, however, that with respect to said deferred installment payment of leasing commissions, in the event that Yuba shall sell said shopping center, then, at Agent's election, the entire balance of leasing commissions due Agent shall be forthwith due and payable by Yuba, said indebtedness to be evidenced by a promissory note. . . ."

The contract also contained the individual defendants' guarantee of Yuba's performance under it.

It is undisputed (and the trial court found) that DDC obtained three leases for the shopping center—one executed by Yuba and Wentz Market, Inc., in March 1961, another between Yuba and W. T. Grant Company in April 1961, and a third signed by Yuba and Thrifty Drug Stores Co., Inc., in May 1961. The judgment against defendants was for leasing commissions derived from DDC's procurement of those three leases, and no others.

DDC's 12-month term as exclusive leasing agent expired on September 20, 1961. Upon evidence to be hereinafter discussed, the court found that Yuba committed an anticipatory breach of the contract on December 3, 1961, and refused thereafter to perform it. The December 3d date was 17 days before the end of the 15 months in which, under the contract, DDC had an exclusive agency to procure the long-term loan.[3] On substantial evidence, the court found that DDC had exerted its best efforts to obtain long-term leases and a long-term loan and that it had performed all things required of it up to the date of Yuba's anticipatory breach. Subsequent to that breach, Yuba obtained a construction loan and a long-term loan through a different agent, with whom it contracted on March 11, 1962. The shopping center was built, and in the fall of 1964 the three tenants obtained by DDC went into possession under their leases.

### DENIAL OF DEFENDANTS' MOTION TO DISMISS

*Background Facts*

The original complaint, which asserted causes of action in quantum meruit and for ordinary (nonanticipatory) breach of contract, was filed on July 15, 1963. In the next six months, that pleading and a first amended complaint were each successfully demurred to by defendants. On February 12, 1964, the trial court denied plaintiffs' motion for leave to file a second amended complaint which alleged defendants' anticipatory breach of contract.

On April 2, 1964, plaintiffs petitioned this court for a writ of mandate to compel the superior court to permit them to file their second amended complaint. (See, *Daum* v. *Superior Court* (1964) 228 Cal.App.2d 283

---

[3]Since there were then 17 days remaining on DDC's exclusive agency to procure a loan and on its obligation not to promote competing financing or leasing, the contract was still bilateral on December 3d even though the leasing agency created by the same contract had expired. Hence there is no merit in defendants' reliance on the rule that there can be no recovery for anticipatory breach of a unilateral contract. (See, *Minor* v. *Minor* (1960) 184 Cal.App.2d 118 [7 Cal.Rptr. 455].)

[39 Cal.Rptr. 443].) On September 1, 1964, we issued a peremptory writ of mandate commanding the trial court to permit plaintiffs to file that amended pleading. Plaintiffs served that peremptory writ upon the superior court on September 2, 1964.

The second amended complaint was filed the same day. A demurrer to it was overruled on October 28, 1964, and the amended pleading was answered on November 16, 1964. Defendants served interrogatories upon plaintiffs on November 13, 1964. On November 24, 1964, *defendants' attorneys agreed to keep plaintiffs' time open to answer those interrogatories.* Plaintiffs answered the interrogatories 15 months later, on February 16, 1966. Plaintiffs did nothing of substance to prosecute their action during that 15-month period.

On March 1, 1966, plaintiffs filed notice of depositions, which were taken on June 9, 1966. Plaintiffs filed a memorandum to set on October 19, 1966, and the case was pretried in December 1966, at which time the court set trial to commence December 12, 1967 (a year later). On December 4, 1967, the court ordered the trial off calendar because it was double set with a condemnation action which had legal preference. The cause was placed on the civil active list. On January 11, 1968, trial was set for March 5, 1968.

On the first day of trial (March 5, 1968), before trial commenced, defendants moved to dismiss plaintiffs' action on the two grounds hereinafter discussed.

*First Ground Urged for Dismissal: The*
*Three-Year Post-Remittitur Provision of*
*Section 583 of the Code of Civil Procedure*

■ Defendants contend the court erred because it denied their motion to dismiss based upon the following portion of section 583 (Code Civ. Proc.): ". . . When in an action *after judgment,* an *appeal* has been taken and *judgment reversed* with cause remanded for a new trial . . . , the action must be dismissed by the trial court . . . unless brought to trial within three years from the date upon which *remittitur* is filed by the clerk of the trial court." (Italics ours.)

Defendants urge that the action was not brought to trial within three years of the "remittitur" issued by this court in the 1964 mandate proceeding (*Daum v. Superior Court, supra,* 228 Cal.App.2d 283). DDC, in resisting defendants' contention, also assumes a "remittitur" issued when we ordered the second amended complaint filed.

Defendants' argument misconstrues this court's function in the 1964 man-

date proceeding. That proceeding was not an appeal. It was an *original* proceeding in this court. *No remittitur was issued;* only a peremptory writ of mandate. (See, Code Civ. Proc., §§ 1085-1088; Cal. Rules of Court, rule 56.) The three-year post-remittitur provision of section 583 was clearly inapplicable to this action.

*Second Ground Urged for Dismissal: The*
*Two-Year "Discretionary" Provision of*
*Section 583 of the Code of Civil Procedure*

Defendants also contend the court erred because it denied their motion to dismiss based upon the following former portion of section 583 (Code Civ. Proc.), which was applicable when the motion was made in 1968: "The court may in its discretion dismiss any action for want of prosecution . . . whenever plaintiff has failed for two years after action is filed to bring such action to trial . . . ."[4]

Reduced to its essentials, defendants' argument attacks the 15-month hiatus in prosecution between the time plaintiffs were served with interrogatories and the date they answered them.

The power to dismiss after the two-year period "should be used 'in view of the facts of the entire situation,' taking into account any unusual circumstances, and acting to promote substantial justice." (*Weeks* v. *Roberts* (1968) 68 Cal.2d 802, 806 [69 Cal.Rptr. 305, 442 P.2d 361].) "The exercise of the trial court's discretion will be disturbed only for clear abuse . . .; and if there is any basis upon which its action can be sustained, and it appears that no injustice will result therefrom, a refusal to dismiss should be upheld. . . ." (*Denham* v. *Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193].)

As shown by the affidavit of plaintiffs' attorney in opposition to the motion, defendants' attorneys had agreed to keep plaintiffs' time open to answer the interrogatories. Hence the court did not abuse its discretion in implicitly concluding that plaintiffs should not be penalized for their 15-month delay in filing those answers.

### SUFFICIENCY OF EVIDENCE OF ANTICIPATORY BREACH

Defendants contend the evidence was insufficient to support the court's finding of anticipatory breach. Their contention is without merit.

"California recognizes an action for anticipatory breach (Civ. Code,

---

[4]Rule 203.5 of the California Rules of Court, effective January 1, 1970 (enacted under the authority given by a 1969 amendment to section 583), sets forth the factors which must now be considered on a motion for such a dismissal.

§ 1440; *Caminetti* v. *Pacific Mut. Life Ins. Co.,* 23 Cal.2d 94, 105 [142 P.2d 741]), and that a definite and unconditional repudiation of the contract by the promisor communicated to the promisee, being a breach of the contract, creates an immediate right of action even though it takes place long before the time prescribed for the promised performance and before conditions specified in the contract have ever occurred. (*Remy* v. *Olds,* 88 Cal. 537 [26 P. 355]; see also 4 Corbin, Contracts, § 959, p. 852.)" (*Daum* v. *Superior Court, supra,* 228 Cal.App.2d at p. 287.)

██ DDC was wholly owned by coplaintiff Harry Daum and his wife. Mr. Daum was president of that corporation and signed the agency contract on its behalf. Except for Mr. Daum, no officer or employee of DDC had any experience in the development of shopping centers. From beginning to end, the record before us shows that defendants dealt with Mr. Daum when they dealt with his corporation.

The evidence shows that, prior to December 3, 1961, Yuba's board of directors (composed of four of the five individual defendants) became dissatisfied with the progress of Mr. Daum in procuring the long-term loan and leases additional to the three he had already obtained. On November 21, 1961, defendant Clay McGowan—a shareholder, director, and president of Yuba—was authorized by Yuba's board to arrange a meeting with Mr. Daum to terminate the relationship between Yuba and DDC.

Mr. McGowan telegraphed Mr. Daum on November 29, 1961, that he wanted to meet him before December 5. Mr. McGowan, his brother Harry (a codefendant), and Mr. Daum met in Lakeview, Oregon, on December 3, 1961. Clay McGowan testified that at the Lakeview meeting he merely explored with Mr. Daum the possibility of a mutual rescission of the contract and offered Mr. Daum $3,500 if he would agree to it. Mr. Daum testified, however, that the two McGowan brothers told him at that meeting that Yuba's board had decided "they were going to get rid of me," and that the McGowans also stated "that I either took this amount of money *or I didn't get any. . . .*" (Italics ours.)

In addition, Yuba's board minutes of August 15, 1963, which were received in evidence, recite as follows: "Fazal Mohamed inquired about a recent law suit filed by Harry Daum and Daum Development Corporation against Yuba Plaza, Inc., Clay McGowan, Robert J. McGowan, Harry McGowan, Fazal Mohamed and Babu Khan. [Par.] *Clay and Harry McGowan* explained that after the expiration [*sic*] of the contract between the corporation and Harry Daum and Daum's corporation, that they had met with Mr. Daum *in Oregon,* had informed him that the corporation *no longer desired to do business with him, that his contract had expired* and that they were willing to offer him, by way of settlement of

any claim that he might have for his work on the Thrifty, Grants and Wentz leases, the sum of *$3,500.00. . . .*" (Italics ours.)

Mr. Daum's attorneys wrote defendant Clay McGowan on December 12, 1961, and informed him that Mr. Daum intended to stand on his rights under the agency contract,[5] and that he rejected "any offer of rescission thereof" by Yuba.

■ In reviewing the evidence, an appellate court must resolve all conflicts therein in favor of the respondent (here, DDC), and it must draw all legitimate and reasonable inferences therefrom to uphold the trial court's findings. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court. (*Yakov* v. *Board of Medical Examiners* (1968) 68 Cal.2d 67, 72 [64 Cal.Rptr. 785, 435 P.2d 553].)

■ Tested by the latter rules, the evidence amply shows that Yuba wrongfully repudiated the contract while it was still bilateral. (See fn. 3, *supra.*)

### Amendment of Complaint During Trial

■ Shortly after trial commenced, plaintiffs requested the court's permission to file a third amended complaint. Over defendants' objection, the court allowed the new pleading to be filed. ■ A trial court's exercise of discretion in permitting pleading amendments at the beginning of trial will be sustained on appeal in the absence of a clear abuse of discretion. (*Deetz* v. *Carter* (1965) 232 Cal.App.2d 851, 856-857 [43 Cal.Rptr. 321].) ■ Defendants now contend there was such abuse.

Defendants' contention cannot be sustained. The third amended complaint, in addition to repeating the quantum meruit and anticipatory breach counts that were included in the second amended complaint, also alleged a self-styled "cause of action" for ordinary (nonanticipatory) breach of contract. These additional allegations simply set forth a different theory of contract breach; they did not assert a new cause of action. (See, *Daum* v. *Superior Court, supra,* 228 Cal.App.2d at p. 286.) Indeed, plaintiffs' original and first amended complaints had likewise been for ordinary breach of contract, so defendants could not claim surprise when that theory reappeared in plaintiffs' third amended pleading after being omitted from their second amended complaint.

---

[5]Manifestation by the injured party of a purpose to require performance by the promisor in spite of repudiation of the contract by him does not nullify its effect as an anticipatory breach. (*Guerrieri* v. *Severini* (1958) 51 Cal.2d 12, 19-20 [330 P.2d 635].)

The new facts alleged by the resurrected count were that the three tenants obtained by DDC had occupied the premises and had commenced rental payments, and that "all things required to be done as a prerequisite to payment of commissions" had been done.

Obviously, because the judgment was based on findings of *anticipatory* breach, defendants could not have been prejudiced by the amendment asserting a claim for *ordinary* breach. Viewed with hindsight, the latter count was surplusage. (See, *Williamson* v. *Egan* (1930) 209 Cal. 343, 348-349 [287 P. 503]; *Bernstein* v. *Rubin* (1957) 152 Cal.App.2d 51, 55 [312 P.2d 755]; *Piltingsrud* v. *Harman* (1949) 93 Cal.App.2d 33 [208 P.2d 444].)

### LUMP SUM JUDGMENT PLUS INTEREST

■ The court gave DDC judgment for $34,924.50—the *total* commissions payable to it for obtaining the three leases—together with 7 percent interest thereon from December 3, 1961, the date Yuba repudiated the contract.

As hereinbefore stated, the contract provided that, under certain conditions, each leasing commission would be paid entirely or partially by installments (with 5 percent interest) instead of all in a lump sum. (See fn. 2, *supra*, and accompanying text.) Defendants requested a special finding concerning only one of those conditions. The court, however, made no findings at all as to whether any of the conditions had occurred.

■ The failure to find on material issues is reversible error. (*Call* v. *Alcan Pacific Co.* (1967) 251 Cal.App.2d 442, 448 [59 Cal.Rptr. 763].) ■ When there has been an anticipatory breach, the promisee may recover damages immediately for a total breach of the contract before performance by the promisor is due thereunder. (*Daum* v. *Superior Court, supra,* 228 Cal.App.2d at pp. 287-288.) The immediacy of such right to recover, however, is not determinative of the measure and manner by which such damages are to be computed. Where the judgment precedes the date all or any part of such performance is due, the promisee's recovery of future damages is limited to their value at the time of judgment. (See, *Caminetti* v. *Pacific Mut. Life Ins. Co.* (1943) 23 Cal.2d 94, 108-110 [142 P.2d 741]; *Richman* v. *Joray Corp.* (4th Cir. 1951) 192 F.2d 660, 663; *Aetna Life Ins. Co.* v. *Geher* (9th Cir. 1931) 50 F.2d 657, 659; *Pollack* v. *Pollack* (Tex. Com. App. 1931) 39 S.W.2d 853, 858; Corbin, Contracts (1951), vol. 4, § 964, pp. 870-871 & fn. 22, and vol. 5, § 1053, p. 310 & fn. 3; cf., *Wood* v. *Wrigley* (1953) 119

Cal.App.2d 90, 97 [258 P.2d 1049]; *Noble* v. *Tweedy* (1949) 90 Cal.App.2d 738, 747 [203 P.2d 778].)

■ The applicability, here, of such measure would result in a judgment for future damages in the aggregate of any and all installments of leasing commissions payable to DDC after judgment, each such installment being discounted from its respective due date back to the date of judgment at the rate of 7 percent simple interest per annum.[6] To this sum should be added any installments payable before judgment, with 7 percent interest on the latter installments from their respective due dates to the date of judgment. (Civ. Code, § 3287.) The value at judgment of the 5 percent interest payments contracted for by the parties (see fn. 2, *supra*) should be similarly computed and awarded, to the extent that such 5 percent interest is found to be applicable.

■ Reversible error lies in the present judgment, as well as in the findings; on any basis, the judgment is erroneous because it awards DDC excessive interest. By allowing 7 percent interest from the date Yuba repudiated the contract (December 3, 1961), which was earlier than the time Yuba's obligation to pay either a lump sum or installments accrued, the judgment gave DDC more than was due by the terms of the contract. (See, Civ. Code, §§ 3300, 3302, 3358.)[7]

Defendants also challenge the findings in respects which either are controverted by the findings themselves or are not shown to have prejudiced defendants. (See, *Scribner* v. *Bertmann* (1954) 129 Cal.App.2d 204, 213 [276 P.2d 697].)

The judgment is reversed as to defendant Babu Kahn, and the trial

---

[6]Use of the "legal" interest rate (Cal. Const., art. XX, § 22) is indicated by *Caminetti* v. *Pacific Mut. Life Ins. Co., supra,* 23 Cal.2d at pp. 108-110, and by *Aetna Life Ins. Co.* v. *Geher, supra,* 50 F.2d at p. 659, thereby avoiding the speculative discount factors suggested in 5 So.Cal.L.Rev. 330 (1932). (See also, *Noble* v. *Tweedy, supra,* 90 Cal.App.2d at pp. 747-748.)

[7]Section 3300 provides: "For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."

Section 3302 provides: "The detriment caused by the breach of an obligation to pay money only, is deemed to be the amount due by the terms of the obligation, with interest thereon."

In relevant part, section 3358 provides: " . . . [N]o person can recover a greater amount in damages for the breach of an obligation than he could have gained by the full performance thereof on both sides. . . ."

court is directed to dismiss the action as to him. As to all other defendants, the judgment is reversed on the issue of damages only. In all other respects, the judgment is affirmed. All parties will bear their respective costs on appeal.

Friedman, Acting P. J., and Regan, J., concurred.

A petition for a rehearing was denied September 24, 1970.