[Civ. No. 12604. Third Dist. July 12, 1972.]

CARGILL OF CALIFORNIA, INC., Plaintiff and Respondent, v. COUNTY OF YOLO et al., Defendants and Appellants.

## COUNSEL

Charles R. Mack, County Counsel, John T. Ketelsen and Robert A. Rundstrom, Deputy County Counsel, for Defendants and Appellants.

Thomas M. O'Connor, City Attorney, and John J. Doherty, Deputy City Attorney, as Amici Curiae on behalf of Defendants and Appellants.

Rodegerdts, Means, Northup & Estey and Frederick R. Estey for Plaintiff and Respondent.

## OPINION

**JANES, J.**—Defendants appeal from a judgment that they refund to plaintiff, with interest thereon, the sum of $8,369.56 paid by plaintiff under

protest as a personal property tax on 13,072,720 pounds of sun-cured alfalfa pellets owned and stored by plaintiff at its leased storage facility at the Port of Sacramento on the lien date, March 6, 1967.[1]

Construing the evidence most favorably to respondent (*Daum Development Corp.* v. *Yuba Plaza, Inc.* (1970) 11 Cal.App.3d 65, 75 [89 Cal.Rptr. 458]), the record shows: Between August 1966 and the end of that year, plaintiff entered into sales contracts with Japanese purchasers which required plaintiff to deliver to Japan a quantity of alfalfa pellets, including the tonnage involved in this action. In January and February 1967, plaintiff booked cargo space on two vessels to transport the pellets to the Far East—the *Dona Ourania* (to be present for loading at the Port of Sacramento from February 12 to 28, 1967) and the *Torben Maersk* (to be present for loading at the same port from March 26 to April 6, 1967). Each freighter was to carry a specified tonnage of that cargo, or "5% more or less [thereof] in ship's option"—a variation permitted by the sales contracts to allow for practical problems of stowage.

To meet its contracts with the Japanese purchasers, plaintiff commenced in September 1966 to order the pellets from one of its corporate subsidiaries, Cal Mealfalfa, which manufactured the pellets at Dixon, California. Cal Mealfalfa produced pellets both for export and domestic consumption; but the domestic pellets were of superior quality and were never delivered to the Port of Sacramento, whereas the export pellets had no domestic market and were always ultimately sent to plaintiff's storage facility—a grain elevator—at the port.

Plaintiff's custom was to puchase most of its export pellets from the Dixon plant, although it also utilized other California producers.[2] Plaintiff took possession of those pellets at the place of manufacture, and they were delivered either by common carrier or by plaintiff's own trucks to its port storage facility. Since the maximum production of export pellets from all sources was 450 tons per day, and a typical vessel at the Port of Sacramento could load 2,000 to 2,500 tons per day, a ship could not be economically loaded by direct daily delivery. Instead, it was necessary to

---

[1] As stated above, plaintiff Cargill of California, Inc., paid the tax. Plaintiff, however, was not the owner of the alfalfa pellets; it leased the storage facility (sometimes called "grain elevator") from the Sacramento-Yolo Port District, warehoused the pellets for their owner (a parent trading corporation of similar name—Cargill, Inc.), and loaded the pellets aboard ship at the direction of the owner, which had sales contracts with Japanese purchasers. For purposes of trial, plaintiff and defendants treated Cargill of California, Inc., and Cargill, Inc., as being the same entity. We therefore do likewise.

[2] The record does not indicate whether the subject 13,072,720 pounds were all produced by Cal Mealfalfa or by other manufacturers as well.

accumulate pellets in the elevator in anticipation of the arrival of one vessel per month for loading.

All pellets brought to the elevator were brought there for the purpose of delivery to a ship. Plaintiff retained authority over retention, disposition, and delivery of its stored pellets, including diversion to another vessel if some catastrophe beset the one scheduled for arrival. On the 1967 lien date, in addition to plaintiff's 13,072,720 pounds being held to satisfy the contracts for Japan, there were similar alfalfa pellets stored in the same elevator on behalf of owners other than plaintiff. According to the testimony, it was "possible" that some of the other pellets were commingled with plaintiff's pellets at that time. No particular pellets were designated for removal from the storage facility when a ship was loaded; only a specified tonnage was ordered transferred. *All* pellets in the elevator on the lien date, however, whether plaintiff's pellets or those of other owners, were stored for ultimate ocean transport, and, according to past experience, all such pellets would eventually be loaded onto some vessel. Although an unspecified tonnage of pellets belonging to other owners had been shipped by ocean-going barge to Hawaii, prior to the March 6 lien date plaintiff's pellets had always been taken from the elevator and shipped to foreign ports.[3]

Some 2,108,000 pounds of the pellets contracted for shipment to Japan —over and above the 13,072,720 pounds still in the elevator on March 6, 1967—had been loaded aboard the *Dona Ourania* the preceding February 27th and were not taxed. The pellets were not packaged, but were loaded aboard ship in bulk. It was "possible" that pellets delivered to the *Dona Ourania* for shipment to plaintiff's customers were commingled with the pellets of another trader. Through no fault of plaintiff, loading was then halted until after the lien date.[4] Between March 7 and March 12, 1967, the loading of pellets aboard the *Dona Ourania* was completed; and thereafter—concluding on April 6, 1967—the *Torben Maersk* was loaded with that portion of the 13,072,720 pounds which still remained.

On the foregoing evidence, the trial court made the following findings which are crucial to this appeal:

---

[3]There was no evidence, however, to support the suggestion in defendants' brief that, prior to the lien date, plaintiff engaged in the practice of lending pellets to others. The record merely shows that, sometime *after April 1967*, two truckloads (about 50 tons) of pellets of unspecified ownership were taken from plaintiff's storage facility; and that plaintiff "loaned" an unspecified quantity of pellets to one other owner "during the spring of 1967 [inferentially, after the lien date] . . . ."

[4]The problem was one of ballasting the vessel. The master of the *Dona Ourania* interrupted the loading of the pellets to take on a rice cargo for stability purposes. The delay was lengthened by compliance with a state requirement that the ship's hatches be cleaned and painted before the rice could be taken aboard.

"11. No domestic market existed for the pellets on hand on March 6, 1967, and all pellets of the same type owned by plaintiff and delivered to plaintiff's facility at the Port of Sacramento are shipped to foreign countries.

"12. The movement of the pellets from the production facility marked the commencement of a continuous journey. The exportation of said pellets was certain at the time such pellets began their trip to plaintiff's port facility.

"13. Accumulation of pellets at the port facility is essential to the convenient and efficient loading of an ocean vessel for the reason that a vessel can load pellets aboard at a much greater rate than pellets can be unloaded from trucks or railroad cars carrying pellets to the port.

"14. Accumulation, storage, and delay in movement at the port facility were reasonable, were incidental to and in furtherance of the shipment of such pellets to a foreign country, and were an integral and necessary part of the process of trans-shipment of such pellets from land to water transportation. Such storage and delay did not constitute such interruption of movement as to cause a cessation of journey or to break the movement of the pellets into an intrastate shipment and a foreign shipment.

"15. As of 12:00 o'clock noon on March 6, 1967, the 13,072,720 pounds of suncured alfalfa pellets in the possession of plaintiff at its facility at the Port of Sacramento were exports."

Responsive to its findings, the trial court concluded that "the tax levied and assessed by defendants is invalid, the same being prohibited as a tax on exports by Article I, Section 10, Clause 2 of the Constitution of the United States of America," which provides in relevant part that "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports . . . ."

Defendants contend that plaintiff's alfalfa pellets first entered into the export stream when they were loaded aboard ship, and therefore that the tonnage still in the storage facility on March 6 was subject to the personal property tax. The contention cannot be sustained.

"Under the import-export clause, a state may not impose a tax against an article of export if the article has commenced its movement abroad and the 'certainty of the foreign destination is plain.'" (*Shell Oil Co.* v. *State Bd. of Equal.* (1966) 64 Cal.2d 713, 718 [51 Cal.Rptr. 524, 414 P.2d 820].) "It is the entrance of the articles into the export stream that marks the start of the process of exportation. Then there is certainty that the goods are headed for their foreign destination and will not be

diverted to domestic use. Nothing less will suffice." (*Empresa Siderurgica* v. *Merced Co.* (1949) 337 U.S. 154, 157 [93 L.Ed. 1276, 1280, 69 S.Ct. 995].)

"The certainty that the goods are headed to sea and that the process of exportation has started may normally be best evidenced by the fact that they have been delivered to a common carrier for that purpose. But the same degree of certainty may exist though no common carrier is involved." (*Richfield Oil Corp.* v. *State Board* (1946) 329 U.S. 69, 82 [91 L.Ed. 80, 92-93, 67 S.Ct. 156].) (Fn. omitted.)

■ In cases arising under the import-export clause, " '. . . goods do not cease to be part of the general mass of property in the State, subject, as such, to its jurisdiction, and to taxation in the usual way, until they have been shipped, or entered with a common carrier for transportation to another State, *or have been started upon such transportation in a continuous route or journey.*' " (*Richfield Oil Corp.* v. *State Board, supra,* 329 U.S. at p. 79 [91 L.Ed. at p. 91], quoting and adopting the principle applied to the commerce clause (U.S. Const., art. I, § 8, cl. 3) in *Coe* v. *Errol* (1886) 116 U.S. 517, 527 [29 L.Ed. 715, 719, 6 S.Ct. 475].)[5] (Italics added.)

In *Carson Petroleum Co.* v. *Vial* (1929) 279 U.S. 95 [73 L.Ed. 626, 49 S.Ct. 292], an exporter shipped oil from inland states to the coastal storage tanks of a corporate subsidiary to fill orders already received from foreign buyers. Shipment was in railroad cars consigned to the exporter. The oil was not segregated or assigned to any particular cargo abroad, but was held in the coastal tanks until a customer's ship arrived or until a sufficient quantity of oil was accumulated to make up a cargo. Title to the oil did not pass until it was loaded aboard ship. The court examined the "continuity of transit" and held that local ad valorem taxation of the stored oil was invalid as an interference with interstate and foreign commerce, and, in so holding, it quoted one of its earlier decisions which said: " ' . . . It must appear that the movement for another State has actually begun and is going on. Solution is easy when the shipment has been delivered to a carrier for a destination in another State. It is much more difficult when the owner retains complete control of the transportation and can change his mind and divert the delivery from the intended interstate destination, . . .' " (279 U.S. at pp. 102-103 [73 L.Ed. at p. 629].)

---

[5]"What the Court said concerning commerce [in *Coe* v. *Errol, supra*] is what we deem to be the correct principle governing exports . . . ." (*Richfield Oil Corp.* v. *State Board, supra,* 329 U.S. at p. 79 [91 L.Ed. at p. 91]; see also, *Shell Oil Co.* v. *State Bd. of Equal., supra,* 64 Cal.2d at p. 723.)

*Carson* emphasized, however, by continued quotation from the same precedent, that " ' . . . The character of the shipment in such a case *depends upon all the evidential circumstances looking to what the owner has done in the preparation for the journey and in carrying it out.* The mere power of the owner to divert the shipment already started does not take it out of interstate commerce, *if the other facts show that the journey has already begun in good faith and temporary interruption of the passage is reasonable and in furtherance of the intended transportation, . . .' "* (279 U.S. at p. 103 [73 L.Ed. at p. 629].) (Italics added.)

The Supreme Court noted: "[T]his Court has had to consider several cases where there was transshipment of the commodity from local carriage in a State to a ship at an export port and conveyance thence to a foreign destination. There has been a liberal construction of what is continuity of the journey, in cases where the Court finds from the circumstances that export trade has been actually intended and carried through." (279 U.S. at pp. 105-106 [73 L.Ed. at p. 630].) The court took further note in *Carson* that the oil had no local market, and it found an analogy in another of its decisions which held that intrastate shipment of lumber to a coastal storage facility, where the exporter selected lumber for particular cargoes, " ' . . . was but a step in its transportation to its real and ultimate destination in foreign countries. In other words, the essential character of the commerce, not its mere accidents, should determine. It was to supply the demand of foreign countries that the lumber was purchased, manufactured and shipped and to give it a various character by the steps in its transportation would be extremely artificial. Once admit the principle and means will be afforded of evading the national control of foreign commerce from points in the interior of a State.' " (279 U.S. at pp. 107-108 [73 L.Ed. at p. 631].)

Similarly, in *Minnesota* v. *Blasius* (1933) 290 U.S. 1, 9-10 [78 L.Ed. 131, 136, 54 S.Ct. 34], the Supreme Court said, "If the interstate movement has begun, it may be regarded as continuing, so as to maintain the immunity of the property from state taxation, despite temporary interruptions due to the necessities of the journey or for the purpose of safety and convenience in the course of the movement. [Citations.] Formalities, such as the forms of billing, and mere changes in the method of transportation do not affect the continuity of the transit. The question is always one of substance, and *in each case it is necessary to consider the particular occasion or purpose of the interruption during which the tax is sought to be levied.* [Citations.]" (Italics added.) In *Joy Oil Co.* v. *State Tax Comm'n.* (1949) 337 U.S. 286, 288 [93 L.Ed. 1366, 1369, 69 S.Ct. 1075], the court again observed that "commodities destined for shipment by water must

be transshipped at the water's edge and so may require a brief period of storage at that point which will not be deemed a delay sufficient to interrupt the continuity of the export process . . . . [The test is whether export was] certain for all practical purposes."[6]

The foregoing principles were summarized by our state Supreme Court in *Von Hamm-Young Co.* v. *San Francisco* (1947) 29 Cal.2d 798 [178 P.2d 745, 171 A.L.R. 274], where the court followed *Carson Petroleum Co.* v. *Vial, supra,* and concluded that the storage of merchandise in San Francisco for an indefinite period "arose entirely from the [wartime] 'lack of facilities for immediate transportation' [citation] and was not longer

---

[6]See, *United States* v. *Gosho Co.* (5th Cir. 1928) 23 F.2d 675: "[F]rom the moment of purchase and before the transportation began, all of the cotton was intended in good faith to be exported [under existing contracts], and there was no probability of its being diverted to sales within the United States. When the rail transportation first started from the interior points, the export movement began. It is immaterial that at that time the ultimate destination of each bale had not been determined. All were intended to go out of the country and were on their way. The temporary stoppage at Galveston for sorting and compression was reasonable and necessary for transshipment, in order to enable the cotton to reach its destination, and cannot be considered as interrupting the export movement." *Held,* assessment of federal transportation tax was illegal under article I, section 9, clause 5 of the United States Constitution (equated—in respect to continuity of movement—with the commerce clause and with art. I, § 10, cl. 2, by *Richfield Oil Corp.* v. *State Board, supra*).

Compare, *Montrose Chemical Corp.* v. *County of Los Angeles* (1966) 243 Cal. App.2d 300, 303-304 [52 Cal.Rptr. 209]: ". . . D.D.T. Concentrate, pursuant to specific purchase orders from a particular purchaser, had been prepared and packaged especially for ocean transport, and, under the stipulated facts, was not saleable in the domestic market. On the tax date the packaged concentrate was being held [at the packager's plant] pending notification as to the ocean vessel to which it was to be delivered for export (and was thereafter delivered to a vessel and exported)." *Held,* the certainty of a foreign destination was plain, and the packaged concentrate was therefore exempt from taxation under article I, section 10, clause 2.

Note also, *Philippine Ref. Corp.* v. *Contra Costa* (1938) 24 Cal.App.2d 665, 669-670 [76 P.2d 163]: "[I]t appears from the allegations of the complaint that shipment [of cocoanut oil] from the Philippine Islands through the plant at Point San Pablo to various purchasers was intended and carried through pursuant to contracts made prior to the time that the journey began; that it was neither practical nor according to business custom to make through shipments in segregated lots to each individual customer at the times and in the amounts called for by the contracts of the purchasers; that the storage tanks in appellant's plant at Point San Pablo were used solely for holding said oil in its original form during a halt in the journey to the purchasers and that none of the oil so held was intended or used for indiscriminate sale. In other words, it appears from said allegations that the oil was held at Point San Pablo solely for a purpose incidental to the transportation to wit, the transfer from ship to rail and the forwarding in tank car lots in accordance with the requirements of the contracts previously made. Such allegations show a continuity of transit . . . ." *Held*—under the commerce clause and under the provisions of article I, section 10, clause 2, pertaining to "Imports"—the complaint showed that the oil temporarily stored at Point San Pablo was not subject to local taxation.

than necessary to obtain shipping space [to Hawaii]." (29 Cal.2d at p. 805.) The court stated: "If the break in interstate transit is merely incident to the interstate journey, such as . . . a delay to promote the, safe or convenient transit of the property [citations], to await ships, or to permit accumulation of sufficient cargo to load a ship [citation], the property remains immune from local taxation. A property tax may be imposed on the cargo, however, if the interruption is 'not in necessary delay or accommodation to the means of transportation . . . but for the business purposes and profit of the [taxpayer]' [citations] . . . ." (*Id.* at pp. 802-803.) As the *Von Hamm-Young* court viewed it, the "crucial question" concerning the taxability of the goods was *"why they were stored* in San Francisco." (*Id.* at p. 804.) (Italics added.)[7]

In the case at bench, defendants rely heavily on *Rice Growers' Association of California* v. *County of Yolo* (1971) 17 Cal.App.3d 227 [94 Cal.Rptr. 847]. The *Rice Growers'* case, however, makes no mention of *Carson Petroleum Co.* v. *Vial, supra,* 279 U.S. 95. Other authorities urged upon us by defendants are distinguishable on their facts; in none of them was there a definite conjunction of certainty of eventual export, actual movement toward a foreign destination, and reasonableness of the incidental interruption occurring in furtherance of that journey—all here found to exist by the trial court. It is clear from the facts herein summarized that such findings were made upon substantial evidence.

Defendants argue that affirmance of the judgment would "expand" the import-export clause (U.S. Const., art. I, § 10, cl. 2) beyond the policies motivating the founding fathers. We are bound, however, by the decisions of the United States Supreme Court (notably *Carson Petroleum Co.* v. *Vial, supra,* 279 U.S. 95) and of our state Supreme Court (*Von Hamm-Young Co.* v. *San Francisco, supra,* 29 Cal.2d 798).

The judgment is affirmed.

Friedman, Acting P. J., and Regan, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied September 7, 1972. Peters, J., was of the opinion that the petition should be granted.

---

[7]To the same effect, see *Export Leaf Tobacco Co.* v. *County of L. A.* (1949) 89 Cal.App.2d 909 [202 P.2d 622].